# EXHIBIT "1"

The Springs Building, LLC

375 E. Warm Springs Road, Suite 100

Las Vegas, NV 89119

Lease Agreement

Between

The Springs building, LLC

And

Virtual Communications Corporation

319 East Warm Springs Road (First Floor)
Las Vegas, Nevada 89119

2014

1

# LEASE AGREEMENT

## Table of Contents

**ARTICLES**                                                                                        **PAGE**

ARTICLE 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6
    DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

ARTICLE 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
    LEASE GRANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

ARTICLE 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
    LEASE TERM  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
        3.1    Delivery of Possession . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
        3.2    (Intentionally Omitted) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8
        3.3    (Intentionally Omitted) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

ARTICLE 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
    USE OF PREMISES AND COMMON AREAS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
        4.1    Premises . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .........   9
        4.2    Common Areas of Building . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
        4.3    Landlord's Rights in Common Areas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

ARTICLE 5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
    BASE RENT AND ADDITIONAL RENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
        5.1    Base Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9
        5.2    Cost of Living Increases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
        5.3    Additional Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
        5.4    Interest on Late Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

ARTICLE 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
    BASE RENT ADJUSTMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

ARTICLE 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
    SERVICES TO BE FURNISHED BY LANDLORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

ARTICLE 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
    IMPROVEMENTS TO BE MADE BY LANDLORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

ARTICLE 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
    MAINTENANCE AND REPAIR OF PREMISES BY LANDLORD . . . . . . . . . . . . . . . . . . . . . . . . .   11

ARTICLE 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
    GRAPHICS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

ARTICLE 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
    CARE OF THE PREMISES BY TENANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

ARTICLE 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
    REPAIRS AND ALTERATIONS BY TENANT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

ARTICLE 13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
    LAWS AND REGULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
        13.1    General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
        13.2    Hazardous Material . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
        13.3    Certain Insurance Risks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

ARTICLE 14. BUILDING REGULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13


ARTICLE 15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
    ENTRY BY LANDLORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

ARTICLE 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
    ASSIGNMENT AND SUBLETTING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

ARTICLE 17 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
    LEINS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

ARTICLE 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
    INSURANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
        18.1    Property Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
        18.2    Liability Insurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
        18.3    Requirements for Insurance Polices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
        18.4    Waiver of Subrogation Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

ARTICLE 19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14
    INDEMNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

**Table of Contents**

## ARTICLES                                                                    PAGE

ARTICLE 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15
          PROPERTY DAMAGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

ARTICLE 21 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15
          CONDEMNATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

ARTICLE 22 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15
          DAMAGES FROM CERTAIN CAUSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

ARTICLE 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16
          EVENTS OF DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

ARTICLE 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16
          LANDLORD'S REMEDIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    16

ARTICLE 25 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17
          LANDLORD'S DEFAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

ARTICLE 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17
          PEACEFUL ENJOYMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

ARTICLE 27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17
          HOLDING OVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

ARTICLE 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17
          SUBORDINATION TO MORTGAGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    17

ARTICLE 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18
          LANDLORD'S LIEN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

ARTICLE 30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18
          ATTORNEY'S FEES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

ARTICLE 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18
          NO IMPLIED WAIVER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

ARTICLE 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18
          PERSONAL LIABILTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    18

ARTICLE 33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19
          SECURITY DEPOSIT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

ARTICLE 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19
          NOTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

ARTICLE 35 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19
          SEVERABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

ARTICLE 36 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19
          RECORDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

ARTICLE 37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19
          GOVERNING LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

ARTICLE 38 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19
          FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19

ARTICLE 39 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20
          TIME OF PERFORMANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

ARTICLE 40 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20
          TRANSFERS BY LANDLORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

ARTICLE 41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20
          COMMISSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

ARTICLE 42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20
          EFFECT OF DELIVERY OF THIS LEASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

ARTICLE 43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20
          CORPORATE AUTHORITY; PARTNERSHIP AUTHORITY . . . . . . . . . . . . . . . . . . . . . . . . . .    20

ARTICLE 44 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20
          JOINT AND SEVERAL LIABILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
20

ARTICLE 45 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20
          INTERPRETATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

Case 18-12320-leb    Doc 37-1    Entered 07/18/18 17:33:18    Page 5 of 83

## Table of Contents

**ARTICLES**                                                      **PAGE**

ARTICLE 46 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20
   INCORPORATION OF PRIOR AGREEMENTS; MODIFICATIONS . . . . . . . . . . . . . . . . . . . . . . .    20

ARTICLE 47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21
   WAIVER OF JURY TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

ARTICLE 48 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21
   NO MERGER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

ARTICLE 49 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21
   COUNTERPARTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

ARTICLE 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21
   EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21

## LIST OF EXIBITS

| **Exhibit** | **Description** | **Principal Reference "In Section / Article"** |
|---|---|---|
| "A" | Legal Description . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1.4 |
| "B" | Floor Plan of the Premises . . . . . . . . . . . . . . . . . . . . . . . . . | 1.15 |

## LEASE AGREEMENT

THIS LEASE AGREEMENT (the "Lease"), is made and entered into as first day of January 2015 by and between The Springs Building, LLC, a Nevada Limited Liability Company ("Landlord"), and VIRTUAL COMMUNICATION CORPORATION., (known as the "Tenant").

W I T N E S S E T H:

## ARTICLE 1

## DEFINITIONS

1.1     "Adjustment Month(s)" shall mean the thirteenth (13th), twenty-fifth (25th), thirty-seventh (37th) and forty-ninth (49th) month(s) of the Lease Term.  Adjustment Month(s) shall also mean, if applicable, the thirteenth month (13th), twenty-fifth (25th), thirty-seventh (37th) and forty-ninth (49th) month(s) of the Second Lease Term For purposes of the foregoing definition, the "first month" of the Lease Term shall be deemed to be the first full calendar month during the Lease Term.

1.2     "Allowance"…. NOT APPLICABLR TO THIS LEASE.

1.3     "Base Rent" shall mean the sum of  One Dollar and Fifty Cents ($1.50) per month for each square foot of Rentable Area comprising the Premises,  319 E. Warm Springs Road
The Base rent due for the first and last months of the Lease Term has been paid to Landlord by Tenant contemporaneously with Tenant's execution hereof.

1.4     "Building shall mean  (a) the parcel of real property described as 319 E. Warm Springs Road,  Las Vegas, Nevada 89119, (b) the office building and parking area built  on such parcel of real property, and (c) any and all other improvements thereon and appurtenances hereto. The street address of the Building is 319 E. Warm Springs Road, Las Vegas, Nevada 89119; and the area leased shall be designated as Suite 100 being the entire first floor of the subject building.

1.5     "Building Core" shall mean the area within the outermost finish face of that portion of the Building that incorporates those areas that provide service to the tenants of that floor and to the Building. These areas of service  include: restroom facilities for men and women along with the vestibule and access, electrical, mechanical, and the telephone rooms, janitor closets, elevators and service elevators along with lobby and stairs, vestibules, and all vertical floor penetrations for mechanical/electrical/plumbing for the Building.

1.6     "Building Shell"  shall mean the condition of the Building completed with the following improvements:  (a) outside walls (not including drywall), core walls, and elevator lobby areas completed to building standard condition for public areas;  (b) unfinished standard concrete floors throughout the Premises, broom clean;  (c)  building standard 110 volt 220 amp. Power supplied to the Building Core along with 277/480 volt fluorescent lighting power supplied to the standard finished located on each floor on which the premises are located; (e) building standard voice communication speakers and smoke detectors in accordance with applicable building codes and provided only at the core.

1.7     "Commencement Date" shall mean the earlier of the date that Tenant actually commences and business operations from the premises on January 1, 2015.

1.8     "Index" shall mean the Consumer Price Index, and it shall not be considered in this lease agreement. (see 5.1).

1.9     "Laws" shall mean all applicable statutes, regulations ordinances, requirements, and orders promulgated by any federal, state, local or regional governmental authority now in force or in force after the Commencement Date.

1.10     "Lease Interest Rate" shall mean the lesser of (a) that fluctuating rate of interest equal to two percentage points (2%) over the rate of interest announced from time to time Wells Fargo Bank of Nevada, N.A. as its prime or reference commercial lending rate (or in the event such bank ceases to announce such rate, then by such other federally regulated banking institution as Landlord shall determine), or (b) the maximum interest rate permitted by law.

1.11     "Lease Term"  shall mean the term commencing on the Commencement Date and continuing until 60 months after the first day of the first full calendar month following the commencement date.

1.12     "Mortgage" shall mean the mortgage under a mortgage under a mortgage or beneficiary under a deed of trust holding a lien encumbering the Building or any part thereof.

6

1.13    "Operating Expenses" shall mean all costs of any kind paid or incurred by Landlord in owning, operating, cleaning, equipping, protecting, lighting, repairing, replacing, heating, air-conditioning and maintaining the Building as a first class office project, and a pro ration of Operating Expenses for all common areas within Park Business Center as provided in the REA or as otherwise determined by Landlord, including by way of illustration but not limitation, all of the following: (a) all amounts charged to the building pursuant to the REA; (b)  Real Property Taxes;  (c) all costs, charges and surcharges for utilities, water, sewage, janitorial, waste disposal and refuse removal and all other utilities and services provides to the Building;  (d) insurance costs for which Landlord is responsible under this Lease or which Landlord or any Mortgage deems necessary or prudent;  (e) any costs levied, assessed or imposed pursuant to any applicable laws; (f) the cost (amortized over such a period as Landlord reasonably determines together with interest at the Lease Interest Rate on the unamortized balance) of any capital improvements to the Building or equipment replacements made by Landlord after the Commencement date that are intended to reduce other Operating Expenses or are required by any Laws or are necessary in order to operate the Building at the same quality level as prior to such replacement; (g) costs and expenses of operation, repair and maintenance of all structural and mechanical portions and components of the Building including, without limitation, plumbing, communication, heating, ventilating and air-conditioning ("HVAC"), elevator, and electrical and other common Building systems; (h) a pro rata portion of the cost of the management office rental for Park Business Center; (I) all costs incurred in the management and operation of the Building including , without limitation, gardening and landscaping, maintenance of all parking areas, structures, maintenance of signs, resurfacing and repaving, painting, lighting, cleaning, and provision of Building security; (j) all personal property taxes levied on or attributable to personal property used in connection with the Building; (k) depreciation on personal property owned by Landlord which is consumed in the operation or maintenance of the Building; (l) rental or lease payments paid by Landlord for rented or leased personal property used in the operation or maintenance of the Building; (m) management fees, wages, salaries and other labor costs incurred in the management and operation of the Building; (n) fees for required licenses and permits; (o) reasonable legal, accounting and other professional fees; (p) reasonable and appropriate reserves for repair and replacement; and  If the project is not fully occupied during any portion of the Lease Term, Landlord shall make an appropriate adjustment to Operating Expenses for such period employing sound accounting and management principles, to determine the amount of Operating Expenses that would have been incurred had the Building been fully occupied during such period. Operating Expenses shall not include depreciation of the Building or equipment therein, commissions of real estate brokers and leasing agents, nor any amounts for tenant improvements.

1.14    "Premises" shall mean that space outlined on the floor plan attached to this Lease as Exhibit "B" and incorporated herein.  The Premises are stipulated for all purposes to contain (11,000) square feet of Rentable Area.

1.15    "REA" shall mean (I) that certain Grant of Reciprocal  Easements and Declaration of Covenants (Phase 1) recorded in the official records of Clark County, Nevada, a copy of which has been delivered to Tenant, as all of such documents may be further amendment or supplemented from time to time; provided, however, that no such further amendment or supplement shall in any event decrease Tenant's rights, materially increase Tenant's financial obligations, or increase Tenant's non-financial obligations under this lease.

1.16    "Real Property Taxes" shall mean and include any form of tax, assessment, license fee, license tax, business license fee, commercial rental tax, levy, charge, penalty, tax or similar imposition, imposed by any authority having the direct power to tax, including any city, county, state or federal government, or any school, lighting, drainage, transportation, air pollution, environmental or other improvement or special assessment district thereof, as against any legal or equitable interest of Landlord in the Building and/or the Premises, including, but not limited to, the following: (a) any tax on Landlord's "right" to rent or "right" to other income from the Premises or as against Landlord's business of leasing the Premises; (b) any assessment, tax, fee, levy or charge previously included within the definition of Real Property Taxes (it is the intention of Tenant and Landlord that all such new and increased assessments, taxes, fees, levies and charges be included within the definition of "Real Property Taxes" for the purpose of this Lease); (c) any assessment, tax, fee, levy or charge allocable to or measured by the area of the Premises or the rent payable hereunder, including, without limitation, any gross income tax or excise tax levied by the state, county, city or federal government, or any political subdivision thereof, with respect to the receipt of such rent, or upon or with respect to the possession, leasing, operating, management, maintenance, alteration, repair, use or occupancy of the Building, or any portion thereof; (d) any assessment, tax, fee, levy or charge upon this transaction creating or transferring an interest or an estate in the Premises; (e) any assessment, tax, fee, levy or charge based upon the number of people employed, working at, using the Premises or the Building, or utilizing public or private transportation to commute to the Premises or the Building; and (f) reasonable legal and other professional fees, costs and disbursements incurred in the connection with proceedings to contest, determine or reduce Real Property Taxes.

Real Property Taxes shall not include federal or state income, franchise, inheritance or estate taxes of Landlord or any of the parties which comprise Landlord.

1.17    "Rentable Area" of the Premises shall mean the total of the following measurements to be determined by Landlord (a) the entire area included within the Premises, being the area bounded by the inside surface of any exterior glass walls (or the inside surface of the permanent exterior of the walls separating the Premises from any public corridors or other public areas, and the centerline of all walls separating the Premises from other areas leased or to be leased to other tenants, (b) a pro rata portion based on the space occupied on the floor or floors on which the Premises is located (the " Floor(s)") of the areas covered by the elevator lobbies, corridors, restrooms, and by mechanical rooms, electrical rooms and telephone closets situated on the Floor(s) (such pro rata portion shall be the same percentage that the

7

amount of Rentable Area in the Premises bears to the Rentable Area on the Floor(s) on which the Premises is located), other than those servicing the entire Building, and (c) a pro rata portion of the lobby area on the ground floor of the Building and of the area of the Building containing the electrical/emergency equipment, fire pump equipment, electrical switching gear, telephone equipment, mail delivery room and other facilities serving the Building (such pro rata portion shall be the same percentage that the amount of Rentable Area on the Premises bears to the total Rentable Area in the entire Building).  The Building is stipulated for all purposes to contain twenty-five Thousand Feet of Rentable Area.

1.18     " Security Deposit" None.  (Last one months rent in lieu)

1.19     "Tenants Share" shall be a fraction of which the numerator is the Rentable Area of the Premises as set forth in Section 1.14 and the denominator is the Rentable Area in the Building as set forth in Section 1.17.

1.20     "Usable Area"     for the Premises shall mean the Rentable Area for the Premises, minus the following reductions as determined by Landlord: (a) the electrical/emergency equipment, fire pump equipment, electrical switching gear, telephone equipment, mail delivery facilities, elevator penthouse, security rooms trash rooms and other areas which service the entire Building as specified in the definition of Rentable Area, and (b) the Premises' pro rata portion of the space occupied on the Floor(s) of the Premises covered by the elevator lobbies, corridors, restrooms, mechanical rooms, electrical rooms and telephone closets situated on such floors as specified in the definition of Rentable Area.

1.21     "Commencement Memorandum" document is hereby waved.  Tenant agrees that the Rentable Area and Useable area of the Premises stated in the lease shall be binding throughout the Lease Term.

## ARTICLE 2
### LEASE GRANT

Subject to and upon the terms and conditions herein set forth, Landlord leases to Tenant and Tenant leases from Landlord the Premises.

## ARTICLE 3
### LEASE TERM

3.1     Delivery of Possession.     Landlord will construct or install in the Premises the Improvements   (hereinafter defined) to be constructed or have delivered to Tenant, and Tenant shall otherwise accept, possession of the Premises in its "as is" condition as of the Commencement Date.  Tenant acknowledges that neither Landlord nor its agents or employees have made any representations or warranties as to the suitability or fitness of the Premises for the conduct of Tenant's business or for any other purpose, nor has Landlord or its agents or employees agreed to undertake any alterations or construct any tenant improvements to the Premises except as expressly provided in this Lease and the Work letter.  If for any reason Landlord cannot deliver possession of the Premises to Tenant on or before the fixed date component of the Commencement Date, this Lease will not be void or voidable, and the Landlord will not be liable to Tenant for any resultant loss or damage, but as Tenant's sole remedy for the delay in Landlord's delivery of the Premises, the fixed date component of the definition of the Commencement Date shall be delayed for the period of delay in Landlord's delivery of the Premises to Tenant.

## ARTICLE 4

### USE OF PREMISES AND COMMON AREAS

4.1     Premises.    The Premises shall be used for general office purposes and for no other purposes.  Tenant agrees not to use or permit the use of the Premises for any purpose which is illegal or prohibited by any applicable Laws, or which, in Landlord's opinion, creates a nuisance or would increase the cost of insurance coverage with respect to the Building.  Tenant shall not use or occupy the Premises in violation of such rules and regulations described in Article 15 below nor in violation of the REA or any other recorded covenants, conditions or restrictions affecting the Building.  Tenant shall not place a load upon the Premises exceeding the average pounds live load per square foot of floor area specified for the Building by the Landlord's architect, with the partitions to be considered part of the live load.  Landlord r the right to prescribe the weight and position of all safes, files and heavy equipment which Tenant desires to place in the Premises so as to distribute properly the weight thereof.

4.2     Common Areas of Building.  Tenant shall have the non-exclusive right to use all areas in the Building, and subject to the rules of the Building referred to in Article 15 below, the following areas ("Common Areas") appurtenant to the Premises:
            (i)      The common entrances, lobbies, restrooms, elevators, stairways and access ways, loading docks, ramps, drives and platforms and any passageways and service ways thereto, and the common pipes, conduits, wires and appurtenant equipment servicing the Premises;

        (ii)     Parking areas; Tenant will occupy approximately 50% of the building and is entitled to 50% of all parking area designated for the subject property, including the covered areas.

        (iii)    To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available;

        (iv)    To use the Common Areas while engaged in making additional improvements, repairs or alterations to the Building, or any portion thereof; and

        (v)     To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Building as Landlord may, in the exercise of sound business judgment, deem to be appropriate.

     4.3     <u>Landlord's Rights in Common Areas.</u>  Landlord reserves the right from time to time without unreasonable interference with Tenant's use:

        (i)    To install, use, maintain, repair and replace pipes, ducts, conduits, wires and appurtenant meters and equipment for service to other parts of the Building above the ceiling surfaces, below the floor surfaces, within the walls and in the central core areas, and to relocate any pipes, ducts, conduits, wires and appurtenants meters and equipment included in the Premises which are located in the Premises or located elsewhere outside the Premises which are located in the Premises or located elsewhere outside the Premises, and to expand the Building:

        (i i)   To make changes to the Common Areas, including, without limitation, changes in the location, size, shape and number of driveways, entrances, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas and walkways and, subject to the Parking Agreement, parking spaces and parking areas:

        ( iii)  To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available:

        (iv)    To use the Common Areas while engaged in making additional improvements, repairs or alterations to the Building, or any portion thereof; and

        (v)     To do and perform such other acts and make such other changes, to or with respect to the Common Areas and Building as Landlord may, in the exercise of sound business judgment, deem to be appropriate.

## ARTICLE 5

### BASE RENT AND ADDITIONAL RENT

     5.1    <u>Base Rent</u>.   Tenant agrees to pay to Landlord during the Lease Term, without any setoff or deduction whatsoever the Base Rent, and all such other sums of money as shall become due hereunder as Additional Rent.  Landlord shall be entitled to exercise all such rights and remedies as are herein provided in the case of the nonpayment of Base Rent.  The annual Base Rent for each calendar year or portion thereof during the Lease Term, together with estimated Additional Rent in lawful money of the United States of America which shall be legal tender at the time of payment, in twelve (12) equal installments on the first day of each calendar month during the initial term of this Lease and any extensions or renewals thereof, and Tenant hereby agrees to pay such Base Rent and Additional Rent to Landlord at Landlord's address provided herein (or such other addresses as may be designated by Landlord in writing From time to time) monthly, in advance, and without demand.  If the Lease Term commences on a day other than the first day of a month or terminates on a day other than the last day of a month, then the installments of Base Rent and Additional Rent for such month or months shall be prorated, based on the number of days in such month.

     5.2    <u>Cost of Living Increases</u>.   The Base Rent shall be increased every other year by three (3) percent;  Landlord shall notify Tenant of the increase by delivering a written statement setting forth the new amount of the Base Rent.  Tenant shall pay the new Base Rent from its effective date. .

     5.3    <u>Additional Rent</u>.  All charges payable by Tenant hereunder other than Base Rent (including, without limitation, Operating Expenses payable pursuant to Article 6 below) are called "Additional Rent."  Unless this Lease provides otherwise, all Additional Rent shall be paid with the next monthly installments of Base Rent.  Base Rent and Additional Rent are sometimes referred to collectively as "Rent."

     5.4    <u>Interest on Late Payments</u>.  All installments of Rent not paid when due and payable shall bear interest at the Lease Interest Rate from the date due until paid.  In addition, if any installment of Rent is not received by Landlord within five (5) days after notice that said amount is past due from Landlord to Tenant, Tenant shall pay to Landlord, as Additional Rent, five percent (5%) of the overdue amount as a late charge.  Landlord's acceptance of any late charge or interest shall not constitute a waiver of Tenant's default with respect to the overdue amount nor prevent Landlord from exercising any of the other rights and remedies available to Landlord under this Lease or any law now or hereafter in effect.

## ARTICLE 6

## BASE RENT ADJUSTMENT

The Base Rent payable hereunder shall be adjusted upward from time to time in accordance with the following provisions:

(a)     Tenant shall pay to Landlord as an adjustment to Rent, an amount equal to the total annual Operating Expenses per square foot of Rentable Area of the Premises.  (i) The total Rentable Area of the Premises as set forth in Section 1.17.  Such amount shall be paid in advance in monthly installments on the same dates as Base Rent is due and payable hereunder based on Landlord's notice delivered to Tenant from time to time setting forth Landlord's good faith estimate of the Operating Expense for the current calendar year.  Landlord shall have the right to adjust such amount to reflect any changes in Landlord's estimate of Operating Expenses.

(b)     By April 1 of each calendar year during the Lease Term, or as soon thereafter as practicable, Landlord shall furnish to Tenant as a statement ("Actual Statement") Of Landlord's actual Operating Expense for the previous calendar year.  If for any calendar year the amounts collected from Tenant for the prior year, as a result of Landlord's estimate of Operating Expenses, exceeds the amount of the Excess actually due during such prior year, then Landlord shall refund to Tenant any overpayment (or at Landlord's option, apply such amount against Rent due or to become due hereunder).  Likewise, Tenant shall pay to Landlord, on demand, any underpayment with respect to the prior year.

(c)     In the event of any dispute as to the amount of the Excess as set forth in the statement of actual Operating Expenses, Tenant shall have the right, after reasonable notice and at reasonable times, to inspect and photocopy, Tenant continues to dispute the amount of the Excess in said statement, Tenant shall be entitled not later than one (1) year following Tenant's receipt of an Actual Statement to retain a national, independent, certified public accountant who is not contracted on a contingency fee basis and is mutually acceptable to Landlord and Tenant to audit Landlord's Operating Expenses records with respect to the calendar year covered by Actual Statement to determine the proper amount of the Excess.  Landlord shall be entitled to review the results of such audit promptly after completion of same.  If such audit proves that Landlord has overcharged Tenant, then within fifteen (15) days after the results of the audit are made available to Landlord, Landlord shall credit Tenant  the amount of overcharge toward the payments of Base Rent and Additional Rent next coming due under this Lease.  If such audit proves that Landlord has undercharged Tenant, and then within fifteen (15) days after the results of the audit are made available to Tenant, Tenant shall pay to Landlord the amount of any such undercharge.  Tenant agrees to pay the cost of such audit, provided the Landlord shall reimburse Tenant the amount of such cost if the audit proves that Landlord's determination of the Excess (as set forth in the Actual Statement of actual Operating Expenses) was in error by more than five percent (5%).  If Tenant shall not request an audit in accordance with the provisions of this Section 6(c) within one (1) year after Tenant's receipt of an Actual Statement, such Actual statement shall be conclusively binding upon Tenant.  Landlord shall be required to maintain records of all Operating Expenses for three (3) years following the issuance of the Operating Expense statement for such Operating Expenses. The payment by Tenant of any amounts pursuant to this Article shall not preclude Tenant from questioning the correctness of any such statement.

## ARTICLE 7

## SERVICES TO BE FURNISHED BY LANDLORD

Landlord agrees to furnish Tenant the following services as an Operating Expense for the Building (except as specifically provided below):

(a)     Routine maintenance and electric lighting service for all Common Areas and service areas of the Building in the manner and to the extent deemed by Landlord to be standard.

(b)     All Building Standard fluorescent bulb replacement in the Premises and fluorescent and incandescent bulb replacement in the Common Areas of the Building.

(c)     Security in the form of limited access to the Building during other than Normal Business hours shall be provided in such form as Landlord deems appropriate.  Landlord may charge a fee for card keys or other security devices.  Landlord, however, shall have no liability to Tenant, its employees, agents, invitees or licensees for loses due to theft of burglary, or for damages resulting from the actions of unauthorized persons on the Premises or in the Building and Landlord shall not be required to insure against any such losses.  Tenant shall cooperate fully in Landlord's efforts to maintain security in the Building and shall follow all regulations promulgated by Landlord which respect thereto.

The failure by Landlord to any extent to furnish, or the interruption or termination of these defined services in whole or part, resulting from causes beyond the reasonable control of Landlord shall not render Landlord liable in any respect nor be constructed as an eviction of Tenant, nor work an abatement of Rent, nor relieve Tenant from the obligation to fulfill any covenant or agreement hereof.  Should any of the equipment or machinery used in the provision of such services for any cause cease to function properly, Tenant shall have no claim for offset or abatement or rent or damages on account of an interruption in service resulting therefrom.

## ARTICLE 8

## IMPROVEMENTS TO BE MADE BY LANDLORD

10

All installations and improvements now or hereafter placed on the Premises shall be for Tenant's account and at Tenant's cost (and Tenant shall pay ad valorem taxes and the cost of any increased insurance premiums thereon or attributable thereto), which cost shall be payable by Tenant to Landlord upon demand as Additional Rent.

## ARTICLE 9

### MAINTENANCE AND REPAIR OF PREMISES BY LANDLORD

Except as otherwise expressly provided herein, Landlord shall not be required to perform any maintenance or to make any repairs to the Premises.

## ARTICLE 10

### GRAPHICS

Landlord shall provide and install, at Tenant's cost, all letters or numerals on doors in the Premises; all such letters and numerals shall be in the standard graphics for the Building and no others shall be used or permitted on the Premises without Landlord's prior written consent. Tenant shall have the right To designate three (3) names for placement on the directory board in the lobby of the Building. Tenants shall have the right of signage on the exterior of the building at a place and location approved by Landlord. All expenses for such signage shall be at the sole expense of the Tenant and Tenant agrees to remove all signage and its evidence at Tenants expense upon expiration of the lease term or any renewal thereof.

## ARTICLE 11

### CARE OF THE PREMISES BY TENANT

Tenant agrees not to commit or allow any waste to be committed on any portion of the Premises, and at the termination of this Lease agrees to deliver up the Premises to Landlord in as good condition as at the Commencement Date of this Lease, ordinary wear and tear expected.

## ARTICLE 12

### REPAIRS AND ALTERATIONS BY TENANT

Tenant covenants and agrees that Tenant shall be responsible, at Tenant's own cost and expense, for costs incurred by Landlord to repair or replace any damage done to the Building, or any part thereof, caused by Tenant or Tenant's agents, employees, invitees, or visitors, to as good a condition as it was in prior to such damage. Tenants shall, when and if needed or whenever requested by Landlord to do so, at Tenant's sole cost and expense, maintain and preserve the Premises in first-class condition, expecting ordinary wear and tear. Any such maintenance and repairs shall be performed by a contractor approved by Landlord. If Tenant fails to make such repairs or replacements promptly, Landlord may, at its option, make repairs or replacements, and Tenant shall pay the cost thereof to Landlord on demand as Additional Rent. Tenant agrees with Landlord not to make or allow to be made any alterations to the Premises, install any vending machines on the Premises, or place signs on the Premises which are visible from outside the Premises, without first obtaining the written consent of Landlord in each such instance, which consent may be given on such conditions as Landlord may elect. Any and all alterations to the Premises shall become the property of Landlord upon termination of this Lease (except for movable equipment or furniture owed by Tenant). Landlord may, nonetheless, require Tenant to remove any and all fixtures, equipment and other improvements installed on the Premises. In the event that Landlord so elects, and Tenant fails to remove such improvements, Landlord may remove such improvements, Landlord may remove such improvements at Tenant's cost, and Tenant shall pay Landlord on demand the cost of restoring the Premises to the condition that existed immediately prior to the construction of such improvements.

## ARTICLE 13

### LAWS AND REGULATIONS

13.1    General.  At its sole cost and expense, Tenant will promptly comply with all Laws, statutes, ordinances, and governmental rules, regulations, or requirements now in force or in force after the Commencement Date, with the requirements of any board of fire underwriters or other similar body constituted nor or after the date, with any direction or occupancy certificate issued pursuant to any law by any public officer or officers, as well as with the provisions of all recorded documents affecting the Premises, insofar as they relate to the condition, use, or occupancy of the Premises.

13.2    Hazardous Materials.

(a)    For purposes of this Lease, "Hazardous Materials" means any explosives, radioactive materials, hazardous wastes, or hazardous substances, including without limitation substances defined as "hazardous substances" in the Comprehensive Environmental Response,

11

Compensation and Liability Act of 1980, as amended, 42 U.S.C. ## 9601-9657; the Hazardous Materials Transportation Act of 1975, 49 U.S.C. ## 1801-1812; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. ## 6901-6987; or any other federal, state, or local statute, law, ordinance, code, rule, regulation, order, or decree regulating, relating to, or imposing liability or standards of conduct concerning hazardous materials, waste, or substances now or at any time hereafter in effect (collectively, "Hazardous Materials Laws").

(b)     Tenant will not cause or permit the storage, use, generation, or disposition of any Hazardous Materials in, on, or about the Premises or the project by Tenant, its agents, employees, or contractors. Tenant will not permit the Premises to be used or operated in a manner that may cause the Premises of the project to be contaminated by any Hazardous Materials in violation of any Hazardous Materials Laws. Tenant will immediately advise Landlord in writing of (1) any and all enforcement, cleanup, remedial, removal, or other governmental or regulatory actions instituted, completed, or threatened pursuant to any Hazardous Materials Laws relating to any Hazardous Materials affecting the Premises; and (2) all claims made or threatened by a third party against Tenant, Landlord, or the Premises relating to damage, contribution, cost, recovery, compensation, loss, or injury resulting from any Hazardous Materials on or about the Premises. Without Landlord's prior written consent, Tenant will not take any remedial action or enter into any agreements or settlements in response to the presence of any Hazardous Materials in, on, or about the Premises.

(c)     Tenant will be solely responsible for and will defend, indemnify and hold Landlord, its agents, and employees harmless from and against all claims, costs, and liabilities, including attorneys' fees and costs, arising out of or in connection with Tenant's breach of its obligations in this Article 13. Tenant will be solely responsible for and will defend, indemnify, and hold Landlord, its agents, and its employees harmless from and against any and all claims, costs and liabilities, including attorneys' fees and costs, arising out of or in connection with the removal, cleanup, and restoration work and materials necessary to return the Premises and any other property of whatever nature located in, on, or about the Building, to their condition existing prior to the introduction of Hazardous Materials by Tenant, its agents, employees harmless from and against any and all claims, costs, and liabilities, including attorneys' fees and costs, arising out of or in connection with the removal, cleanup, and restoration work and materials necessary to return the Premises and other property of whatever nature located in, on, or about the Building, to their condition existing prior to the introduction of Hazardous Materials by Tenant, its agents, employees or contractors. Tenant's obligations under this Article 13 will survive the expiration or other termination of this Lease.

13.3     <u>Certain Insurance Risks</u>. Tenant will not do or permit to be done any act or thing upon the Premises or the Building which would (I) jeopardize or be in conflict with fire insurance policies covering the Building or covering any fixtures and property in the Building; (ii) increase the rate of fire insurance applicable to the Building to an amount higher than it otherwise would be for general office use of the Building; or (iii) subject Landlord to any liability or responsibility for injury to any person or persons or to a property by reason of any business or operation being carried on upon the Premises.

## ARTICLE 14

## BUILDING RULES

Tenant will comply with the rules of the Building adopted and altered by Landlord from time to time and will cause all of its agents, employees, invitees and visitors to do; all changes to such rules will be sent by Landlord to Tenant in writing.

## ARTICLE 15

## ENTRY BY LANDLORD

Tenant agrees to permit Landlord or its agents or representatives to enter into and upon any part of the Premises at all reasonable hours (and in emergencies at all times) to inspect the same, or to show the Premises to prospective purchasers, Mortgages, tenants or insurers, to clean or make repairs, alterations or additions thereto, and Tenant shall not be entitled to any abatement or reduction of rent by reason thereof.

## ARTICLE 16

## ASSIGNMENT AND SUBLETTING

16.1     Tenant shall not assign, sublease, transfer or encumber this Lease or any interest therein. Any attempted assignment or sublease by Tenant in violation of the terms and covenants of this Article 16 shall be void; however the right to sublet a portion of Tenants space shall not be unreasonably withheld

16.2     If Tenant requests Landlord's consent to an assignment of this Lease of subletting of all or part of the Premises, Landlord shall have the option (without limiting Landlord's other rights hereunder) of terminating this Lease upon (30) days' notice. Landlord may then, at Landlord's option, lease space to the prospective assignee or subtenant. If Landlord should fail to notify Tenant in writing of its decision within a (30) day period after Landlord is notified in writing of the proposed assignment or sublease, Landlord shall be deemed to have refused to consent to such proposed assignment or sublease, and to have elected to keep this Lease in full force and effect. As noted in article 16.1 the right to sublet a portion of Tenants space shall not unreasonably withheld

12

16.3      All cash or other proceeds of any assignment, sale or sublease of Tenant's interest in this Lease, whether consented to by Landlord or not, shall be paid to Landlord notwithstanding the fact that such proceeds exceed the Rent called for hereunder, unless Landlord agrees to the contrary in writing, and Tenant hereby assigns all rights it might have or ever acquire in any such proceeds to Landlord.  This covenant and assignment shall run with the land and shall bind Tenant and Tenant's heirs, executors, administrators, personal representatives, successors and assigns.  Any assignee, sublessee or purchaser of Tenant's interest in this Lease (all such assignees, sublessees and purchasers being hereinafter referred to as "Successors"), by assuming Tenant's obligations hereunder, shall assume liability to Landlord for all amounts paid to persons other than Landlord by such Successor in consideration of any such sale, assignment or subletting, in violation of the provisions hereof.

16.4      No assignment, sublease or other transfer consented to by Landlord, shall release Tenant or change Tenant's primary liability to pay the rent and perform all other obligations of Tenant under this Lease.  Upon the occurrence of any default under this Lease, Landlord may proceed directly against Tenant without the necessity of exhausting any remedies against any subtenant or assignee.  Upon termination of this Lease, any permitted subtenant shall, at Landlord's option, attorn to Landlord and Shall pay all rent directly to Landlord.  Landlord's acceptance of Rent from any other person shall not constitute consent to any subsequent transfer.  Landlord may consent to subsequent assignments or modifications of this Lease by Tenant's transferee, without notifying Tenant or obtaining its consent.  Such action shall not relieve Tenant of its liability under this Lease.

16.5      No merger shall result from Tenant's sublease of the Premises under this Article 16, Tenant's surrender of this Lease or the termination of this Lease in any other manner.  In any such event, Landlord may terminate any or all subtenancies or succeed to the interest of Tenant as sublandlord thereunder.

## ARTICLE 17

## LIENS

Tenant will not permit any mechanic's lien(s) or other liens to be placed upon the Premises or the Building and nothing in this Lease shall be deemed or constructed in any way as constituting the consent or request of Landlord, express or implied, by inference or otherwise, to any person for the performance of any labor or the furnishing of any materials to the Premises, or any part thereof, nor as giving Tenant any right, power, or authority to contract for or permit the rendering of ant services or the furnishing of any materials that would give rise to any mechanics' or other liens against the Premises.  In the event any such lien is attached to the Premises, then, in addition to any other right or remedy of Landlord, Landlord may, but shall not be obligated to, discharge the same.  Any amount paid by Landlord for any of the aforesaid purposes shall be paid by Tenant to Landlord on demand as Additional Rent.

## ARTICLE 18

## INSURANCE

18.1      <u>Property Insurance</u>.      Landlord shall maintain property coverage insurance on the Building Shell and appurtenant structures in the Common Areas in such amounts as Landlord and any Mortgagees deem necessary or appropriate.  Such insurance shall be maintained at the expense of Landlord (as part of Operating Expenses), and payments for losses thereunder shall be made solely to Landlord or the Mortgagees as their respective interests shall appear.  Tenant shall obtain and keep in force at all times during the Lease Term, a policy or policies of insurance covering loss or damage to all of the improvements, betterments, income and business contents located within the Premises in the amount of the full replacement value thereof as ascertained by the Tenant's insurance carrier, as the same may exist from time to time, against all perils normally covered in an "all risk" policy (including the perils of flood and surface waters), as such term is used in the insurance industry; provided, however, that Tenant shall have no obligations to insure against earthquake.

18.2      <u>Liability Insurance</u>.  Tenant shall, at Tenant's expense, maintain a policy of Commercial General Liability insurance insuring Landlord and Tenant against liability arising out of the ownership, use, occupancy or maintenance of the Premises.  Such insurance shall be on occurrence basis providing single-limit coverage in an amount not less than One Million Dollars ($1,000,000.00) per occurrence.  The initial amount of such insurance shall be subject to periodic increase upon reasonable demand by Landlord based upon inflation, increased liability awards, recommendation of professional insurance advisers, and other relevant factors.  However, the limits of such insurance shall not limit Tenant's liability nor relieve Tenant of any obligation hereunder.  Landlord shall be named as an additional insured on said policies and the policies shall contain the following provision: "Such insurance as afforded by this policy for the benefit of Landlord shall be primary as respects any claims, losses or liabilities arising out of the use of Premises by the Tenant or by Tenant's operation and any insurance carried by Landlord shall be excess and non-contributing."  The policy shall insure Tenant's performance of the indemnity provisions of Article 18.

18.3      <u>Requirements for Insurance Policies</u>.  Insurance required to be maintained by Tenant hereunder shall be in companies holding a "General Policyholders' Rating" of A or better and a "financial rating" of 10 or better, as set forth in the most current issue of "Best Insurance Guide."  Tenant shall promptly deliver to Landlord, within thirty (30) days of the Commencement Date, original certificates evidencing the existence and amounts of such insurance.  No such policy shall be cancelled or subject to reduction of coverage except after sixty (60) days prior written notice to Landlord.  Tenant shall, within

thirty (30) days prior to the expiration, cancellation or reduction of such policies, furnish Landlord with renewals or "binders" thereof. Tenant shall not do or permit to be done anything which shall invalidate the insurance policies required under this Lease.

18.4    Waiver of Subrogation Rights.   Tenant and Landlord shall obtain from the issuer of the insurance policies referred to in Section 18.1 a waiver of subrogation provision in said policies referred to in Section 18.1 a waiver of subrogation provision in said policies and Tenant and Landlord hereby release, relieve and waive any and all rights of recovery against Landlord or Tenant, or against the employees, officers, agents and representatives of Landlord or Tenant, for loss or damage arising out of or incident to the perils insured against under Section 18.1 which perils occur in, on or about the Premises or the Building, whether due to the negligence of Landlord or Tenant or their agents, employees, contractors or invitees. The extent of the waiver described in the immediately preceding sentence is limited to the extent of insurance carried by Landlord and Tenant pursuant to Section 18.1 of this Lease.

## ARTICLE 19

### INDEMNITY

Tenant shall indemnify and hold harmless Landlord and all agents, servants and employees of Landlord from and against all claims, losses, damages, liabilities, expenses (including reasonable attorneys' fees), penalties and charges arising from or in connection with (I) Tenant's use of the Premises during the Lease Term, or (ii) the conduct of the Tenant's business, or (iii) any activity, work or things done, permitted or suffered by Tenant in or about the Premises during the Lease Term. Tenant shall further indemnify and hold harmless Landlord from and against any and all claims, loss, damage, liability, expense (including reasonable attorneys' fees), penalty or charge arising from any default in the performance of any obligation on Tenant's part to be performed under the terms of this Lease, or arising from any negligence of Tenant, or any of Tenant's agents, contractors, or employees, and from and against all costs, attorneys' fees, expense and liabilities incurred in the defense of any such claim or any action or proceeding brought thereon. If any action or proceeding be brought against Landlord by reason of any such claim, Tenant, upon notice from Landlord, shall defend the same at Tenant's expense by legal counsel reasonably satisfactory to Landlord. Tenant, as a material part of its consideration to Landlord, hereby assumes all risk of damage to property or injury to persons in or upon the Premises arising from any cause and Tenant hereby waives all claims in respect thereof against Landlord. Notwithstanding the foregoing, Tenant shall not be required to defend, save harmless or indemnify Landlord from any liability for injury, loss, accident or damage to any person or property resulting from Landlord's negligence or willful acts or omissions, or those of Landlord's officers, agents, contractors or employees. Tenant's indemnity is not intended to nor shall it relieve any insurance carrier of its obligation under policies required to be carried by Tenant pursuant to the provisions of this Lease to the extent that such policies cover the results of negligent acts or omissions of Landlord, its officers, agents, contractors or employees, or the failure of Landlord to perform any of its obligations under this Lease.

## ARTICLE 20

### PROPERTY DAMAGE

If the Premises or any part thereof shall be damaged by fire or other peril, Tenant shall give prompt written notice thereof to Landlord. In case the Building shall be so damaged that substantial alteration or reconstruction of the Building shall, in Landlord's sole opinion, be required (whether or not the Premises shall have been damaged by such peril) or in the event any Mortgage shall require that the insurance proceeds payable as a result of a peril be applied to the payment of the mortgage debt or in the event of any material uninsured loss to the Building, Landlord may, at its option, terminate this Lease by notifying Tenant in writing of such termination within ninety (90) days after the date of such casualty. If Landlord does not thus elect to terminate this Lease, Landlord shall, as Landlord's sole obligation, commence and proceed with reasonable diligence to restore the Building Shell to substantially the same condition in which it was immediately prior to the occurrence of the peril. When the Building shell has been restored by Landlord, tenant shall complete the restoration of the Premises, including the reconstruction of all improvements in order to complete the Premises and restore the Premises to the same condition and build-out as prior to the casualty, including all improvements constructed. Any plans and specifications for such restoration and reconstruction and the contractor retained by Tenant for such restoration and reconstruction shall be subject to the approval of Landlord. All insurance proceeds payable pursuant to polices maintained by Tenant pursuant to Section 18.1 shall be applied by Tenant to such reconstruction. Landlord shall not be liable for any inconvenience or annoyance to Tenant or injury to the business of Tenant resulting in any way from such damage or the repair thereof, except that, subject to the provisions of the next sentence, Landlord shall allow Tenant a fair diminution of rent to the extent the Premises are unfit for occupancy during the period commencing as of the date of the casualty and continuing for the period of time, as determined by Landlord, required for Tenant and Landlord to complete the repairs described in this Article 20. If the Premises or any other portion of the Building is damaged by fire or other peril resulting from the fault of negligence of tenant or any of Tenant's agents, employees, or invitees, the rent hereunder shall not be diminished during the repair of such damage and Tenant shall be liable to Landlord for the cost of the repair and restoration of the Building caused thereby to the extent such cost and expense are not covered by insurance proceeds.

## ARTICLE 21

### CONDEMNATION

14

If the whole or substantially the whole of the Building of the Premises shall be taken for any public or quasi-public use, by right of eminent domain or otherwise or shall be sold in lieu of condemnation, then this Lease shall terminate as of the date when physical possession of the Building or the Premises is taken by the condemning authority.  If less that the whole or Landlord (whether or not the Premises are affected thereby) may terminate this Lease by giving written notice thereof to Tenant, in which event this Lease shall terminate as of the date when physical possession of such portion of the Building or Premises is taken by the condemning authority.  If the Lease is not so terminated upon any such taking or sale, the Base Rent payable hereunder shall deems feasible, restore the Building and the Premises to substantially their former condition, but such work shall not exceed the scope of the work done by Landlord in originally constructing the Building and installing Building Standard Improvements in the Premises, nor shall Landlord in any event be required to spend for such work an amount in excess the amount received by Landlord as compensation for such taking.  All amounts awarded upon a taking of any part or all of the Building or the Premises shall belong to Landlord, and Tenant shall not be entitled to and expressly waives all claims to any such compensation.

## ARTICLE 22

### DAMAGES FROM CERTAIN CAUSES

Landlord shall not be liable to Tenant for any loss or damage to any property or person occasioned by theft, fire, act of God, public enemy, injunction, riot, strike, insurrection, war court order, requisition, or order of governmental body or authority or by any other cause beyond the control of Landlord.  In addition, Landlord shall not be liable for any damage or inconvenience which may arise through repair or alteration of any part of the Building or Premises.

## ARTICLE 23

### EVENTS OF DEFAULT

The following events shall be deemed to be events of default ("Events of Default") by Tenant under this Lease:

(a)     If Tenant abandons the Premises or if Tenant vacates the Premises for thirty (30) consecutive days;

(b)     If Tenant fails to pay Rent or any other charge required to be paid by Tenant, as and when due;

(c)     If Tenant fails to perform any Tenant's non-monetary obligations under this Lease for a period of ten (10) days after written notice from Landlord; provided that if more than ten (10) days are required to complete such performance, Tenant shall not be in default if Tenant commences such performance within such ten (10) day period and thereafter diligently pursues its completion;

(d)     If (I) Tenant makes a general assignment or general arrangement for the benefit of creditors;  (ii) a petition for adjudication of bankruptcy or reorganizaton or rearrangement is filed by or against Tenant and is not dismissed within thirty (30) days; (iii) a trustee or receiver is appointed to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease and possession is not restored to Tenant within thirty (30) days; or (iv) substantially all of tenant's assets located at the Premises or of Tenant's interest in this Lease is subjected to attachment, execution or other judicial seizure which is not discharged within thirty (30) days.  If a court of competent jurisdiction determines that any of the acts described in this subsection (d) is not a default under this Lease, and a trustee is appointed to take possession (or if Tenant remains a debtor in possession) and such trustee or Tenant transfers Tenant's interest hereunder, then Landlord shall receive, as Additional Rent, the difference between the rent (or any other consideration) paid in connection with such assignment or sublease and the rent payable by Tenant hereunder; or

(e)     If any representation or warranty made by Tenant or by a subtenant or assignee in connection with this Lease shall have been false or misleading as of the date such representation or warranty was made.

## ARTICLE 24

### LANDLORD'S REMEDIES

Upon the occurrence of any Event in Default of Tenant, Landlord may, at any time thereafter, with or without notice or demand and without limiting Landlord in the exercise of any right or remedy which Landlord may have:

15

(a)    Terminate Tenant's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Tenant shall immediately surrender possession of the Premises to Landlord.  In such event, Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's default, including without limitation (I) the worth at the time of the award of the unpaid Base Rent, Additional Rent and other charges which had been earned at the time of termination; (ii) the worth at the time of the award of the amount by which the unpaid Base rent, Additional Rent and other charges which would have been earned after termination until the time of the award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; (iii) the worth at the time of the award of the amount by which the unpaid Base Rent, Additional Rent and other charges which would have been paid for the balance of the Lease term after tie of the award exceeds the amount of such rental loss that tenant proves could have been reasonably avoided; and (iv) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligation under the Lease or which in the ordinary course of things would be likely to result therefrom, including, but not limited to, any costs or expenses incurred by Landlord in maintaining or preserving the Premises after such default, the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation or alteration of the Premises, Landlord's reasonable attorneys' fees incurred in connection herewith, and any real estate commission paid or payable.  As used in subparts (I) and (ii) above, the "worth at the time of the award"  is computed by allowing interest on unpaid amounts at the rate of eighteen percent (18%) per annum, or such lesser amount as may then be the maximum lawful rate, accruing the date such payments are due until paid.  As used in subpart (iii) above, the "worth at the time of the award" is computed by discontinuing such amount at the discount rate at the Federal Reserve Bank of San Francisco at the time of the award, plus one percent (1%);

(b)    Maintain Tenants right to possession, in which case this Lease shall continue in effect whether or not Tenant shall have abandoned the Premises.  In such event, Landlord shall be entitled to enforce all of Landlord's rights and remedies under this Lease, including the right to recover rent as it becomes due hereunder.  Landlord's election to maintain Tenant's right to possession shall not prejudice Landlord's right, at any time thereafter to terminate Tenant's right to possession and proceed in accordance with Section 24 (a) above; or

(c)    Pursue any other remedy nor or hereafter available to Landlord under Laws or judicial decisions of the State of Nevada.

Landlord's exercise of any right or remedy shall not prevent it from exercising any other right or remedy.

## ARTICLE 25

## LANDLORD'S DEFAULT

Landlord shall be in default hereunder in the event Landlord has not begun and pursued with reasonable diligence the cure of any failure of Landlord to meet its obligations hereunder within thirty (30) days' of receipt by Landlord of written notice from Tenant of the alleged failure to perform.  In no event shall tenant have the right to terminate or rescind this Lease as a result of Landlord's default as to any covenant or agreement contained in this Lease or as a result of the breach of any promise or inducement hereof, whether in the Lease or elsewhere.  Tenant hereby waives such remedies for default hereunder and for breach of any promise or inducement shall be limited to a suit for damages and/or injunction. In addition, tenant hereby covenants that, prior to the exercise of any such remedies; it will give any Mortgagee notice and a reasonable time to cure any default by landlord.

## ARTICLE 26

## PEACEFUL ENJOYMENT

Tenant shall, and may peacefully have, hold, and enjoy the Premises, subject to the other terms thereof, provided that Tenant pays the Rent and other sums herein recited to be paid by Tenant and performs all of Tenant's covenants and agreements herein contained.  This covenant and any and all other covenants of Landlord shall be binding upon Landlord and its successors only with respect to breaches occurring during  its or their respective periods of ownership of Landlord's interest hereunder

## ARTICLE 27

## HOLDING OVER

16

In the event of holding over by Tenant after the expiration or other termination of this Lease or in the event Tenant continues to occupy the Premises after the termination of Tenant's right of possession pursuant to Article 24 above, Tenant shall, throughout the entire holdover period, pay rent equal to twice the Base Rent and Additional Rent which would have been applicable had the Term of this Lease continued through the period of such holding over by Tenant.  If Tenant remains in possession or all or any part of the Premises after the expiration of the Lease Term, with the express written consent of Landlord: (a) such tenancy will be deemed to a periodic tenancy from month-to-month only; (b) such tenancy will not constitute a renewal or extension of this Lease for any further term; and (c) such tenancy may be terminated by Landlord upon the earlier than thirty (30) days' prior written notice or the earliest date permitted by law. Such month-to-month tenancy will be subject to every other term, condition, and covenant contained in this Lease including the Base Rent and Additional Rent provisions.  Nothing contained in this Article 27 shall be construed as consent by Landlord to any holding over the Premises by "Tenant and Landlord expressly reserve the right to require Tenant to surrender possession of the Premises to Landlord upon expiration or earlier termination of this Lease.  If Tenant fails to surrender the Premises upon expiration or earlier termination of this Lease despite demand to do so by Landlord, Tenant shall indemnify and hold Landlord harmless from all loss or liability, including, without limitation, any claim made by any succeeding tenant founded on or resulting from such failure to surrender.

## ARTICLE 28

### SUBORDINATION TO MORTGAGE

Tenant accepts this Lease subject and subordinate to any mortgage, deed of trust or other lien presently existing or hereafter arising upon the Premises, upon the Building as a whole, and to any renewals, refinancing and extensions thereof, but Tenant agrees that any such Mortgagee shall have the right at any time to subordinate such mortgage, deed of trust or other lien to this Lease on such terms and subject to such conditions as such Mortgagee may deem appropriate in its discretion.  Landlord is hereby irrevocably vested with full power and authority to subordinate this Lease to any mortgage, deed of trust or other lien now existing or hereafter placed upon the Premises, or the Building as a whole, and Tenant agrees upon demand to execute such further instruments subordinating this Lease or attorning to the holder of any such liens as Landlord may request.  In the event that any mortgage or deed of trust is foreclosed or conveyance in lieu of foreclosure is made for any reason, Tenant shall, if requested by the Mortgagee, attorn to and become the Tenant of the successor-in-interest to Landlord and in such event Tenant hereby waives its right under any current or future law which gives or purports to give Tenant any right to terminate or otherwise adversely affect this Lease and the obligations of Tenant hereunder.  If in connection with obtaining construction, interim or permanent finance for the Building, the lender shall request modifications to this Lease as a conditioning as such financing, Tenant will not withhold or delay its consent thereto, provided that such modifications do not increase the obligations of Tenant hereunder and do not otherwise materially adversely affect Tenant's rights hereunder.  In the event that Tenant should fail to execute any instrument described in this Article 28 promptly as requested, Tenant hereby irrevocably constitutes Landlord as its attorney-in-fact to execute such instrument in Tenant's name, place and stead, it being agreed that such power is one coupled with an interest.  Tenant agrees that it will be from time to time within ten (10) business days following a request by Landlord execute and deliver to such persons as Landlord shall request  a statement in recordable form certifying that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as so modified), stating the dates to which rent and other charges payable under the Lease have been paid, stating that Landlord is not in default hereunder (or if Tenant alleges a default stating the nature of such alleged default) and further stating such other matters as Landlord shall reasonably require.  Tenant acknowledges that any such statement may be relied upon by any Mortgagee, prospective Mortgagee, purchaser or prospective purchaser of the Building or any interest therein.

## ARTICLE 29

### LANDLORD'S LIEN

Tenant hereby grants to Landlord a lien and security interest on all property of Tenant now or hereafter placed in or upon the Premises, and such property shall be and remain subject to such lien and security interest of Landlord for payment of all rent and other sums agreed to be paid by Tenant herein. The provisions of this paragraph relating to such lien and security interest shall constitute a security agreement under and subject to the Nevada Uniform Commercial code so that Landlord shall have and may enforce a security interest on all property of Tenant now or hereafter placed in or on the Premises, in addition to and cumulative of the Landlord's liens and rights provided by law or by the other terms and provisions of this Lease.  Tenant agrees to execute as debtor such financing statement or statements as Landlord now or hereafter may request.  Landlord may at its election at any time file a copy of this Lease as a financing statement.  Notwithstanding the above, Landlord shall neither sell nor withhold from Tenant, Tenant's business records.

## ARTICLE 30

### ATTORNEY'S FEES

In the event Tenant defaults in the performance of any of the terms of this Lease and Landlord employs an attorney in connection therewith, Tenant agrees to pay Landlord's reasonable attorney's fee

17

## ARTICLE 31

### NO IMPLIED WAIVER

The failure of Landlord to insist at any time upon the strict performance of any covenant or agreement herein, or to exercise any option, right, power or remedy contained in the Lease, shall not be construed as a waiver or a relinquishment thereof for the future.  No payment by Tenant or receipt by Landlord of a lesser amount than the monthly installment of Rent due under this Lease shall be deemed to be other than on account of the earliest Rent due hereunder, nor shall any endorsement or statement on any check or payment as Rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in this Lease provided.

## ARTICLE 32

### PERSONAL LIABILTY

The liability of Landlord to Tenant for any default by Landlord under the terms of this Lease shall be limited to the lesser of (I) the interest of Landlord in the Building, or (ii) the interest Landlord would have in said Building if the same were encumbered by third party debt in the amount equal to eighty percent (80%) of the value of said Building (as such value is determined by Landlord) and Tenant agrees to look solely to such amount for recovery of any judgement from Landlord, it being intended that Landlord shall not be personally liable for any judgement or deficiency.

## ARTICLE 33

### SECURITY DEPOSIT

33.1    Increase of Security Deposit.  Waived.

33.2    Application of Security Deposit Waived.

## ARTICLE 34

### NOTICE

Any notice in this Lease provided for must, unless otherwise expressly provided herein, be in writing, and may, unless otherwise in this Lease expressly provided, be given or be served by depositing the same in the United States mail, postage paid and certified and addressed to the party to be notified, with return receipt requested, or by delivering the same in the person to an officer of such party, or by prepaid telegram, when appropriate, addressed to the party to be notified at the address stated in this Lease or such other address, notice of which has been given to the other party.  Notice deposited in the mail in the manner hereinabove described shall be effective from and after the expiration of three (3) calendar days after it is so deposited.

## ARTICLE 35

### SERVERABILTY

If any term or provision of this Lease, or the application thereof to any person of circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term provision to persons or circumstances other that those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and enforced to the fullest extent permitted by law notwithstanding the invalidity of any other term or provision hereof.

## ARTICLE 36

### RECORDATION

Tenant agrees not to record this Lease or any memorandum hereof.

## ARTICLE 37

18

## GOVERNING LAW

This Lease and the rights and obligations of the parties hereto shall be interpreted, construed, and enforced in accordance with the Laws of the State of Nevada.

## ARTICLE 38

## FORCE MAJEURE

Whenever a period of time is herein prescribed for the taking of any action by Landlord, Landlord shall not be liable or responsible for, and there shall be excluded from the computation of such period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations or restrictions, or any other cause whatsoever beyond the control of Landlord.

## ARTICLE 39

## TIME OF PERFORMANCE

Except as expressly otherwise herein provided, with the respect to all required acts of Tenant, time is of the essence of this Lease.

## ARTICLE 40

## TRANSFERS BY LANDLORD

Landlord shall have the right to transfer and assign, in whole or in part, all its rights and obligations hereunder and in the Building and property referred to herein, and in such event and upon such transfer Landlord shall be released from any further obligations hereunder, and Tenant agrees to look solely to such successor in interest of Landlord for the performance of such obligations.

## ARTICLE 41

## COMMISSIONS

Landlord and Tenant hereby indemnify and hold each other harmless against any loss, claim, expense or liability with respect to any commissions or brokerage fees claimed on account of the execution and/or renewal of this Lease due to any action of the indemnifying party.

## ARTICLE 42

## EFFECT OF DELIVERY OF THIS LEASE

Landlord has delivered a copy of this Lease to Tenant for Tenant's review only, and the delivery hereof does not constitute an offer to Tenant or option.  This Lease shall not be effective until a copy executed by both Landlord and Tenant is delivered to and accepted by Landlord.

## ARTICLE 43

## CORPORATE AUTHORITY; PARTNERSHIP AUTHORITY

If Tenant is a corporation, each person signing this Lease on behalf of Tenant represents and warrants that he or she has full authority to do so and that this Lease binds the corporation.  Within thirty (30) days after this Lease is signed, Tenant shall deliver to Landlord a certified copy of a resolution of Tenant's Board of directors authorizing the execution of this Lease or other evidence of such authority reasonably acceptable to Landlord.  If Tenant is a partnership, each person signing this Lease for Tenant represents and warrants that he or she is a general partner of the partnership, that he or she has full authority to sign for the partnership and that this Lease binds the partnership and all general partners of the partnership.  Tenant shall give written notice to Landlord of any general partner's withdrawal or addition.  Within thirty (30) days after this Lease is signed, Tenant shall deliver to Landlord a copy of Tenant's recorded statement of partnership or certificate of limited partnership.

## ARTICLE 44

## JOINT AND SEVERAL LIABILITY

19

All parties signing this Lease as Tenant shall be jointly and severally liable for all obligations of Tenant.

## ARTICLE 45

### INTERPRETATION

The captions of the Articles of this Lease, and each specific Section within the respective Articles, are to assist the parties in reading this Lease and are not a part of the terms or provisions of this Lease.  Whenever required by the context of this Lease, the singular shall include the plural and the plural shall include the singular.  The masculine, feminine and neuter genders shall each include the other.  In any provisions relating to the conduct, acts or omissions of Tenant, the term "Tenant" shall include Tenant's agents, employees, contractors, invitees, successors or others using the Premises with Tenant's expressed or implied permission.

## ARTICLE 46

### INCORPORATION OF PRIOR AGREEMENTS; MODIFICATIONS

This Lease is the only agreement between the parties pertaining to the lease of the Premises and no other agreements are affective.  All amendments of this Lease shall be in writing and signed by all parties.  Any other attempted amendment shall be void.

## ARTICLE 47

### WAIVER OF JURY TRIAL

Landlord and Tenant by this Article 47 waive trial by jury in any action, proceeding, or counterclaim brought by either of the parties to this Lease against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, or any other claims (except claims for personal injury or property damage), and any emergency statutory or any other statutory remedy.

## ARTICLE 48

### NO MERGER

The voluntary or other surrender of this Lease by tenant or the cancellation of this Lease on account of Tenant's default will not work a merger, and will, at Landlord's option, (a) terminate all or any subleases and subtenancies or (b) operate as a assignment to Landlord of all or any subleases or subtenancies.  Landlord's option under this Article 48 will be exercised by written notice to Tenant and all know sublessees or subtenants in the Premises or any part of the Premises.

## ARTICLE 49

### COUNTERPARTS

This Lease may be executed in counterparts, and, when all counterpart documents are executed, the counterparts shall constitute a single binding instrument.

## ARTICLES 50
### EXHIBITS

All Exhibits as listed on the "List of Exhibits" and as attached herein are incorporated herein and made a part of this lease for all purposes.

IN WITNESS WHEREOF, Landlord and Tenant have executed this lease (which may be in multiple original counterparts) as of the day and year first above written.

**EXHIBIT "A"**
*Legal Description*

A PARCEL OF LAND SITUATED IN A PORTION OF THE NORTHEAST QUARTER (NE1/4) OF THE NORTHEAST QUARTER (NE1/4) OF SECTION 9, TOWNSHIP 22 SOUTH, RANGE 61 EAST, M.D.B. & M., CLARK COUNTY, NEVADA, BEING A PORTION OF LOT 1 OF BERMUDA & WARM SPRINGS COMMERCIAL CENTER AS SHOWN BY MAP THEREOF ON FILE IN BOOK 79 OF PLATS, PAGE 65, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST QUARTER (NE1/4) OF SAID SECTION 9;
THENCE SOUTH 00°04'18" WEST, ALONG THE EAST LINE THEREOF, 291.94 FEET TO A POINT;
THENCE SOUTH 89°50'36" WEST, 911.02 FEET TO THE POINT OF BEGINNING;
THENCE CONTINUING SOUTH 89°50'36" WEST, 191.83 FEET;
THENCE NORTH 00°02'48" EAST, 242.11 FEET TO A POINT ON THE SOUTH RIGHT OF WAY LINE OF WARM SPRINGS ROAD (100' WIDE);
THENCE NORTH 89°51'09" EAST, ALONG SAID SOUTH LINE 191.83 FEET;
THENCE SOUTH 00°02'48" WEST, 242.08 FEET TO THE POINT OF BEGINNING.

SAID PARCEL IS ALSO SHOWN AS LOT 1-E ON THAT CERTAIN RECORD OF SURVEY ON FILE IN FILE 153, OF SURVEYS, PAGE 71, RECORDED JANUARY 20, 2006 AS INSTRUMENT NO. 2803 IN BOOK 20060120, IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.

**EXHIBIT "B"**
*Floor Plan of the Premises*



DIMENSION PLAN

319 E. WARM SPRINGS ROAD, 1ST FLOOR
LAS VEGAS, NEVADA

SUZANA RUTAR, Architect Ltd
Architectural Design & Planning

1950 E. Warm Springs Road
Las Vegas, Nevada 89119
Telephone    (702) 263-6179
Fax          (702) 361-0502
A Professional Corporation

**LANDLORD - THE SPRINGS BUILDING, LLC**

BY

R. J.  Robinson (Managing Member)

**TENANT - VIRTUAL COMMUNICATIONS CORPORATION**

BY

S. Vernon Rodriguez, CFO

23

# EXHIBIT "2"

## NOTIFICATION TO PAY RENTS TO PERSON OTHER THAN LANDLORD

| | |
|---|---|
| **Tenant:**<br>**Property Occupied By Tenant (the "Premises"):** | **Virtual Communications Corporation**<br>**319 East Warm Springs Road (First Floor), Las Vegas, Nevada 89119** |
| **Landlord:** | **The Springs Building, LLC** |
| **Assignee:** | **Western Alliance Bank, as successor in interest to Centennial Bank** |
| **Address of Assignee:** | **2701 E. Camelback Rd Ste. 110 Phoenix, Arizona 85016** |
| **Name and Telephone Number of Contact Person:** | **(602) 346-7301**<br>**Janice Maxwell** |

1.      The Assignee named above has become the person entitled to collect your rents on the Premises listed above under the Deed of Trust dated December 14, 2007, recorded in the Official Records of Clark County, Nevada (the "Clark Official Records") on December 20, 2007, as Document No. 20071220-0005531, granting Lender a security interest in real property located at Bermuda and Warm Springs Coml Ctr, Plat Book 79 Page 65, PT Lot 1, located at 319 East Warm Springs Road, Las Vegas, Nevada, and identified as Assessor's Parcel Number 177-09-514-009, the Assignment of Rents dated December 14, 2007 and recorded in the Clark Official Records on December 20, 2007 as Instrument No. 20071220-0005532, and as amended by the Modification of Deed of Trust and Assignment of Rents and Leases, dated September 30, 2014 ("Assignment of Rents"), recorded in the Clark Official Records on October 16, 2014 as Instrument No. 20141016-0002192.   You may obtain additional information about the Assignment of Rents and the Assignee's right to enforce it at the address listed above.

2.      The Landlord is in default under the Assignment of Rents. Under the Assignment of Rents, the Assignee is entitled to collect rents from the Premises.

3.      This notification affects your rights and obligations under the agreement under which you occupy the Premises (your "Agreement"). In order to provide you with an opportunity to consult with a lawyer, if your next scheduled rental payment is due within 30 days after you receive this notification, neither the Assignee nor the Landlord can hold you in default under your Agreement for nonpayment of that rental payment until 10 days after the due date of that payment or 30 days following the date you receive this notification, whichever occurs first. You may consult a lawyer at your expense concerning your rights and obligations under your Agreement and the effect of this notification.

4.      You must pay to the Assignee at the address listed above all rents under your Agreement which are due and payable on the date you receive this notification and all rents accruing under your Agreement after you receive this notification. If you pay rents to the Assignee after receiving this notification, the payment will satisfy your rental obligation to the extent of that payment.  **Please make all rents payable to the Assignee.**

5.      Unless you occupy the Premises as your primary residence, if you pay any rents to the Landlord after receiving this notification, your payment to the Landlord will not discharge your rental obligation, and the Assignee may hold you liable for that rental obligation notwithstanding your payment to the Landlord.

6.      If you have previously received a notification from another person that also holds an assignment of the rents due under your Agreement, you should continue paying your rents to the person that sent that notification until that person cancels that notification. Once that notification is cancelled, you must begin paying rents to the Assignee in accordance with this notification.

7.      Your obligation to pay rents to the Assignee will continue until you receive either:

    (a)      A written order from a court directing you to pay the rent in a manner specified in that order; or

    (b)      Written instructions from the Assignee cancelling this notification.

Dated this 5th day of _December_ 2017.

**WESTERN ALLIANCE BANK**

By: _[signature]_

Its: _Vice President_

# EXHIBIT "3"

# COHEN | JOHNSON | PARKER | EDWARDS

ATTORNEYS & COUNSELORS AT LAW
255 E. Warm Springs Rd., Suite 100
Las Vegas, Nevada 89119
702-823-3500 tel
702-823-3400 fax

H. Stan Johnson, Esq.
sjohnson@cohenjohnson.com
cohenjohnson.com

August 24, 2017

**<u>Via Email</u>**
Ron Robinson
319 Ea. Warm Springs Rd, Suite 100
Las Vegas, Nevada 89119

      Re: Purchase of 319 Ea. Warm Springs Road

Dear Ron:

      Enclosed please find the execution version of the purchase agreement.  I have signed it on behalf of the buyer.  Please execute it and send back a fully executed copy.  We look forward to working with you on closing this transaction.

                    COHEN|JOHNSON|PARKER|EDWARDS

                    H. Stan Johnson, Esq.

HSJ/

# EXHIBIT "4"

# EXTENSION AGREEMENT

## PROMISSORY NOTE A & B

**THIS EXTENSION AGREEMENT** ("**Agreement**") is entered into as of September _29_, 2017, by and among: (1) **THE SPRINGS BUILDING, LLC** ("**Borrower**"), a Nevada limited liability company; (2) **PARK PLACE PROPERTIES, LLC** ("**Park Place**"), a Nevada limited liability company; (3) **RONALD J. ROBINSON** ("**Robinson**") (Robinson and Park Place, shall collectively be referred to as the "**Guarantors**"); (4) Robinson in his capacity as trustee of **THE SCOTSMAN TRUST DATED JUNE 1, 1996**, a Nevada Trust (the "**Trust**" or "**Pledgor**"); and (5) **WESTERN ALLIANCE BANK**, an Arizona corporation (together with its successors and assigns "**Lender**").

<strong>RECITALS:</strong>

The following recitals are a material part of this Agreement:

A.      The Loan is evidenced by an Amended and Restated Promissory Note (Note A), dated September 30, 2014, in the original principal amount of $4,000,000, executed by Borrower in favor of Lender, and an Amended and Restated Promissory Note (Note B), dated September 30, 2014, in the original principal amount of $1,743,655.65, executed by Borrower in favor of Lender (collectively, the "**Notes**").

B.      The Notes are secured by the security documents including, but not limited to, a Deed of Trust dated December 14, 2007, recorded in the Official Records of Clark County, Nevada (the "**Clark Official Records**") on December 20, 2007, as Document No. 20071220-0005531, granting Lender a security interest in real property located at 375 Warm Springs Road, Las Vegas, Nevada and identified as Assessor's Parcel Number 177-09-514-009 (the "**Property**"), and as amended by Modification of Deed of Trust and Assignment of Rents and Leases, dated September 30, 2014, recorded in the Clark Official Records on October 16, 2014 as Instrument No. 20141016-0002192.

C.      The Borrower's Loan was unconditionally guaranteed by each of the Guarantors Robinson and Park Place pursuant to a personal guaranty executed on December 14, 2007 ("**Guaranty**").

D.      The Notes are further secured by the security documents including, but not limited to, a Deed of Trust, Security Agreement, Assignment of Rents, and Fixture Filing dated September 30, 2014, recorded in the Official Records of San Bernardino County, California (the "**San Bernardino Official Records**") on October 21, 2014, as Document No. 2014-0392826, wherein the Trust granted Lender a security interest in additional real property located at 40588 Ironwood Drive, Big Bear Lake, California 92315 (the "**California Property**") and a Deed of Trust, Security Agreement, Assignment of Rents, and Fixture Filing dated September 30, 2014, recorded in the **Clark Official Records** on October 16, 2014, as Document No. 20141016-0002214, granting Lender a security interest in real property located at 808 5th Street, Boulder City, Nevada 89005, and identified as Assessor's Parcel Number 186-09-610-034 (the "**Boulder Property**") pursuant to the Amendment to Loan Documents dated September 30, 2014.

E.      The Loan matured by its own terms on August 31, 2017 ("**Maturity Date**").

F.      As of the Maturity Date, the outstanding principal balance due and owing from the Borrower under the Loan was $5,531,439.84, excluding any fees, interest, penalties or any other charges under the Loan documents.

G.      As of the date of this Agreement, the outstanding principal balance of Note A is $3,787,784.19.

EXTENSION AGREEMENT (SPRINGS BUILDING)

H.      As of the date of this Agreement, the outstanding principal balance of Note B is $1,743,655.65.

I.      Borrower entered into the Sale and Purchase Agreement dated August 25, 2017 (the "**Purchase Agreement**"), as the seller, and Cohen-Johnson, LLC as the buyer (the "**Buyer**").

J.      Lender is agreeable to extending the Maturity Date to October 31, 2017, subject to the terms and conditions hereof and provided that such extension shall be without prejudice to the future exercise of Lender remedies under the Loan Documents and Lender does not hereby waive any of Lender remedies under the Loan Documents.

K.      The Effective Date of this Agreement shall be the date of the execution of this Agreement by all parties.

L.      Unless the context requires otherwise, references in this Agreement to the Loan Documents shall be deemed to refer to such documents as amended or supplemented by this Agreement and the Notes, and as such documents may be further amended, modified, extended, replaced or supplemented from time to time.

## CONTRACTUAL PROVISIONS:

NOW, THEREFORE, in consideration of the Recitals set forth above which are incorporated herein as if set forth below in full as a substantive, contractual part of this Agreement, and the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  **Acknowledgements and Reaffirmations.**

    1.1. **Reaffirmation of Obligations by Borrower and Guarantors**.  As of the Effective Date, Borrower and Guarantors hereby consent to the extension of the Maturity Date to October 31, 2017 and hereby unconditionally confirm, ratify and reaffirm the Loan and all of their respective obligations under the Notes, the Loan Agreement, the Deeds of Trust, Guaranties and all of the other Loan Documents and any amendments, extensions, renewals and increases of or to any of the foregoing, and all costs and expenses of Lender incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with any of the foregoing, including reasonable attorneys' fees and expenses (hereinafter referred to collectively as the "**Obligations**") and agree to continue to keep, observe and comply with all covenants, obligations, terms and conditions therein, including, without limitation, the obligation to pay the unpaid principal balance due and owing under the Note and all interest thereon, as modified by this Agreement. Borrower and Guarantors hereby confirm, ratify and reaffirm, as of the Effective Date, all of their respective representations, warranties and covenants contained in the Loan Documents.

    1.2. **Acknowledgement of Debt.**  Borrower and Guarantors and Lender confirm and acknowledge that Loan is in default and that the entire obligation is now due and owing.  As of the Effective Date of this Agreement, outstanding principal balance due and owing from the Borrower under the Loan was $5,531,439.84, excluding any fees, interest, penalties or any other charges under the Loan documents.  Lender is not waiving its rights to any fees, interest, penalties or any other charges provided under the Loan documents.

    1.3. **Extension Terms.**  Lender shall provide Borrower with an extension (the "**Extension**") of the Maturity Date from August 31, 2017 to October 31, 2017 pursuant to the terms set forth below in Section 1.4 through 1.6.

EXTENSION AGREEMENT (SPRINGS BUILDING)

**1.4.** Lender shall provide Borrower with a Discounted Payoff (the "**DPO**") of the Loan in the amount of $4,000,000.00. The DPO shall be revoked by the Lender in the event the a) Purchase Agreement is cancelled or modified without the Lender's written consent or approval, b) Borrower files a voluntary petition under any Chapter of the Bankruptcy Code, 11 U.S.C. § 101-1532, or in any manner to seek relief, protection, reorganization, liquidation, dissolution, or similar relief for debts under any other local, state, federal or other insolvency laws or laws providing for relief of debtors in equity, either at the present time, or at any time hereafter, or (ii) directly or indirectly cause any involuntary petition under any Chapter of the Bankruptcy Code to be filed against Borrower, or (iii) directly or indirectly to cause Borrower to become the subject of any proceedings pursuant to any other state, federal or other insolvency laws or laws providing for the relief of the debtor, either at the present time, or at any time hereafter, c) appointment of a receiver over the Borrower, or Borrower consents to or acquiesces to the appointment of any trustee, receiver, conservator, or liquidator, or d) Borrower fails to remit the DPO to Lender on or before October 31, 2017.

**1.5.** As a condition of the Extension, Borrower shall remit to Lender the Loan payment in the amount of $23,550.07 due September 1, 2017, and the Loan payment due October 1, 2017. Borrower's failure to make the October 1, 2017 Loan payment prior to October 31, 2017 shall increase the DPO to $4,023,550.07.

**1.6.** Lender will consent to the sale of the Property to the Buyer, which consent is conditional and limited solely to the sale of the Property at the purchase price Borrower communicated to Lender as set forth in the Purchase Agreement dated August 25, 2017 (or another price that is deemed acceptable to Lender in the event there is any change to the purchase price, and subject to Lender's review of any purchase agreement and amendments thereto), on the following terms and conditions: Executed joint escrow instructions to be prepared by Lender, providing for the earnest money deposit in the amount of $100,000.00 ("**EMD**") to be remitted directly to Lender by the title company in the event the Buyer forfeits the EMD under the Purchase Agreement.

**1.7. Continuation of Indebtedness.** The indebtedness evidenced by the Notes shall remain in full force and effect. Such indebtedness constitutes the outstanding principal indebtedness and any unpaid and accrued interest, fees and expenses evidenced by the Note and secured by the Trust Deeds, which indebtedness shall continue to be secured by the Trust Deeds. Nothing contained in this Agreement shall be deemed to impair the priority of, or to extinguish or otherwise impair, either the indebtedness secured by the Trust Deeds or the liens of the Trust Deeds.

**1.8. Application of Funds.** Lender shall apply any payments made by Borrower or Guarantors toward the payment of all fees, charges and expenses incurred by Lender in connection with the Loan and, as to any remaining funds, toward the payment of interest, then principal on the Loan; provided, however, Lender reserves the right to modify the application of funds in its sole discretion.

**1.9. Negotiations.** Except as otherwise provided in this Agreement, there are no agreements, representations, covenants, or promises concerning the extension of the Maturity Date under the Loan Documents or the waiver of any existing or alleged default, or any future default or event of default hereunder or any event of default under any of the Loan Documents. As more particularly set forth herein, no agreement, representation, covenant, or promise concerning the extension of the Maturity Date, or any other matter related thereto, shall be binding or enforceable and may not be relied upon unless reduced to writing and signed by the person against whom enforcement is sought. All negotiations shall be deemed compromise negotiations and shall be inadmissible in evidence pursuant to Rule 408 of the Federal Rules of Evidence and any similar state rule.

EXTENSION AGREEMENT (SPRINGS BUILDING)

**1.10. No Modification.**  Nothing contained herein shall in any manner be construed to amend or modify the terms or provisions of the Loan Documents including, without limitation, any terms or provisions relating to the accrual of any interest on any outstanding and unpaid amount due and payable under the Loan Documents, unless expressly modified by this Agreement.

**1.11. Additional Acknowledgements.**  Borrower and Guarantors declare and acknowledge, for the specific reliance and benefit of Lender, that

(a)  Borrower and Guarantors have no right, claim, defense or right of offset of any kind or in any amount with respect to this Agreement, the Note, the Loan Agreement, the Trust Deed, Guaranties, or any of the other Loan Documents;

(b) Lender has a properly perfected first priority security interest in the Personal Property and that Borrower and Guarantors have no right, claim or defense of any kind to the first priority properly perfected security interest of Lender in the Personal Property.

(c)  Except as provided for in this Agreement, all amounts paid by Borrower to Lender pursuant to or in connection with the execution and delivery of this Agreement, except as otherwise set forth herein, shall be applied pursuant to the terms of the Note;

(d)  The indebtedness evidenced by the Note shall remain in full force and effect and shall continue to accrue interest, any applicable fees, charges and expenses, and such indebtedness shall continue to be secured by the instruments provided for in the Loan Documents;

(e)  The obligations evidenced by the Guaranties shall remain in full force and effect; and

(f)  Nothing contained in this Agreement shall be deemed to impair the priority of, or to extinguish or otherwise impair, either the indebtedness secured by the Trust Deed or the properly perfected security interest of Borrower in the Personal Property.

## 2. Consent to Extension Terms.

In reliance upon the representations, warranties and covenants set forth herein by Borrower and Guarantors, Lender hereby consents to the Extension Terms as of the Effective Date.  Lender's consent to the Extension Terms is not intended to be, and shall not be construed as, a consent to any subsequent request or action which requires Lender's consent pursuant to the terms of the Loan Documents.

## 3. Effective Date; Termination, Remedies.

**3.1. Effective Date.**  This Agreement shall be effective only upon the date on which Borrower and Guarantors have satisfied all of the following conditions in a manner acceptable to Lender, as determined in the sole and absolute discretion of Lender, but in no event later than September 29, 2017 (the "**Effective Date**"):

(a)  By Borrower, copy of the resolutions or minutes evidencing the due authorization of the execution, delivery and performance and the consummation by Borrower of the transactions contemplated hereby, in substantially the form attached hereto as **Exhibit A** (the "**Borrower Authorization**");

EXTENSION AGREEMENT (SPRINGS BUILDING)

(b)  Execution of Assignment of EMD and sale proceeds relating to sale of Property to Buyer no later than October 13, 2017, in substantially the form attached hereto as **Exhibit C** (the "**Assignment**");

(c)  Any other agreement, certificate, instrument or document as may be reasonably requested by Lender; and

**3.2. Termination.**  Without demand for performance or any other notice of any kind to Borrower or any Guarantor, Lender's agreement to the extension of the Maturity Date under this Agreement shall automatically terminate and Lender shall be free to exercise any and all rights and remedies it may otherwise have under the Loan Documents, this Agreement and/or applicable law upon the occurrence of any of the following ("**Termination Event**"):

(a)  Determination by Lender that any representation or warranty made by any Borrower or Guarantor under this Agreement was false or misleading;

(b)  Any default under this Agreement or the occurrence of any additional event of default under the Loan Documents, as modified under this Agreement; or

(c)  Any action or attempt by any Borrower or Guarantor or representative thereof to challenge, repudiate or otherwise render void any of the Loan Documents, this Agreement or any provision thereof.

(d)  Failure to execute Borrower Authorization within 5 calendar days of signing this Agreement.

**3.3. Remedies.**  Upon the occurrence of a Termination Event, Lender shall be free to exercise any and all rights and remedies it may otherwise have under the Loan Documents, this Agreement and/or applicable law, including, but not limited to, foreclosure of the Property.

**3.4.** Guarantors agree that in the event Borrower surrenders the Property to Bank pursuant to a deed in lieu of foreclosure, or sells or refinances the Property for an amount less than the outstanding indebtedness, that they shall be jointly and severally liable for any deficiency, which deficiency shall be the difference between the then outstanding indebtedness and the fair market value of the Property at the time of such surrender, sale or refinance as determined by an appraisal obtained by Bank.

**4. Representations and Warranties.**

**4.1. Representations and Warranties – Borrower.**  Borrower represents and warrants to Lender as of the Effective Date that:

(a)  Borrower is duly organized, validly existing and in good standing under the laws of its state of formation or organization and is duly qualified and authorized to conduct business in the State in which the Property is located, and has full power and authority to own, lease and operate the Property, and to conduct its affairs as now being conducted and as proposed to be conducted;

(b)  Borrower has full power and authority to enter into, execute, deliver and carry out this Agreement and to perform its obligations hereunder and all such actions have been duly authorized by all necessary actions on its part;

EXTENSION AGREEMENT (SPRINGS BUILDING)

(c)  This Agreement has been duly executed and delivered by Borrower and constitutes a legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms, subject to bankruptcy, insolvency and other similar laws affecting the rights of creditors generally;

(d)  To the best of Borrower's knowledge and after giving effect to the provisions of this Agreement, there are no Events of Default under the provisions of the Loan Documents, nor are there any conditions which with the giving of notice or the passage of time or both may constitute an Event of Default under the provisions of the Loan Documents;

(e)  The Loan Documents are in full force and effect;

(f)  There are no subordinate liens of any kind covering or relating to the Property, nor are there any mechanics' or construction liens or liens for delinquent taxes or assessments encumbering the Property, nor has notice of any such lien or notice of intent to file any such lien been received;

(g)  To the best of Borrower's knowledge, there are no pending or threatened condemnation or annexation proceedings affecting the Property, or any agreements to convey any portion of the Property or any rights thereto not disclosed in this Agreement, including, without limitation, to any governmental agency;

(h)  No consent, which has not been obtained, to the Agreement is required under any agreement to which Borrower is a party, including, without limitation, any trust agreement, lease, construction agreement, operating or management agreement or deed of trust, mortgage or Trust Deed (other than the Loan Documents);

(i)  The execution, delivery and performance of this Agreement, (A) does not conflict with or result in a violation of Borrower's organizational documents or any judgment, order or decree of any court or arbiter in any proceeding to which Borrower is a party, and (B) does not conflict with, or constitute a material breach of, or constitute a material default under, any contract, agreement or other instrument by which Borrower is bound or to which Borrower is a party;

(j)  No proceeding is pending for the dissolution or annulment of Borrower, and all license, income and franchise taxes due and payable by Borrower have been paid in full; and

(k) There is no bankruptcy, receivership or insolvency proceeding pending or against Borrower.

**4.2. <u>Representations and Warranties – Guarantors.</u>** The Guarantors individually represent and warrant to Lender as of the Effective Date that:

(a)  Each Guarantor, where applicable, is a natural person, acting in an individual capacity, and has full power and authority to conduct its affairs as now being conducted and as proposed to be conducted;

(b)  Each Guarantor, where applicable, is duly organized, validly existing and in good standing under the laws of its state of formation or organization and is duly qualified and authorized to conduct business in the State in which it operates, and has full power and authority to conduct its affairs as now being conducted and as proposed to be conducted;

EXTENSION AGREEMENT (SPRINGS BUILDING)

(c)  This Agreement has been duly executed and delivered by Guarantors and constitutes a legal, valid and binding obligation of Guarantors, enforceable against Guarantors in accordance with its terms, subject to bankruptcy, insolvency and other similar laws affecting the rights of creditors generally;

(d)  To the best knowledge of Guarantors and after giving effect to the provisions of this Agreement, there are no Events of Default under the provisions of the Loan Documents, nor are there any conditions which with the giving of notice or the passage of time or both may constitute an Event of Default under the provisions of the Loan Documents;

(e)  The Loan Documents executed by Guarantors are in full force and effect;

(f)  The execution, delivery and performance of this Agreement (A) does not conflict with or result in a violation of any judgment, order or decree of any court or arbiter in any proceeding to which any Guarantor is a party, and (B) does not conflict with, or constitute a material breach of, or constitute a material default under, any contract, agreement or other instrument by which any Guarantor is bound or to which any Guarantor is a party; and

(g)  There is no bankruptcy, receivership or insolvency proceeding pending or against any Guarantor.

## 5. Confirmation of Waivers.

Borrower and Guarantors, without limiting the generality of their respective obligations under the Loan Documents, each hereby confirms and ratifies the submission to jurisdiction and waivers set forth in the Loan Documents.

## 6. No Impairment of Lien; No Satisfaction.

Nothing set forth herein shall affect the priority or extent of the liens of the Trust Deed, the Security Agreement or any of the other Loan Documents, nor, except as expressly set forth herein, release or change the liability of any party who may now be, or after the Effective Date may become, liable, primarily or secondarily, under the Loan Documents.  This Agreement does not, and shall not be deemed or construed to, constitute the creation of new indebtedness or the satisfaction, discharge or extinguishment of the debt secured by the Loan Documents.

## 7. Miscellaneous.

**7.1. Further Assurances.**  Each Borrower and Guarantor hereby covenants and agrees to cooperate with Lender and to execute and deliver, or cause to be executed and delivered, all such other documents and instruments, and shall take all such other action that Lender may reasonably request from time to time in order to accomplish and satisfy the provisions and purposes of this Agreement, including such confirmations and/or corrective instruments as Lender may reasonably require.

**7.2. Time is of the Essence.**  Time is of the essence in the performance of this Agreement and the Loan Documents.

**7.3. Notices.**  All notices, demands, requests, consents, approvals and other communications required or permitted hereunder ("**Notices**") must be in writing and will be effective upon receipt. Notices may be given in any manner to which the parties may separately agree, including electronic mail.  Without limiting the foregoing, first-class mail, facsimile transmission and commercial courier

EXTENSION AGREEMENT (SPRINGS BUILDING)

service are hereby agreed to as acceptable methods for giving Notices. Regardless of the manner in which provided, Notices may be sent to a party's address as set forth above or to such other address as any party may give to the other for such purpose in accordance with this section.

**7.4. Preservation of Rights.** No delay or omission on the Lender's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Lender's action or inaction impair any such right or power. The Lender's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Lender may have under other agreements, at law or in equity.

**7.5. Illegality.** This Agreement is intended to be performed in accordance with and only to the extent permitted by applicable law. If any provision contained in this Agreement should be invalid, illegal or unenforceable in any respect, it shall not affect or impair the validity, legality and enforceability of the remaining provisions of this Agreement.

**7.6. Changes in Writing.** No modification, amendment or waiver of, or consent to any departure by any Borrower or Guarantor from, any provision of this Agreement will be effective unless made in a writing signed by the party to be charged, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which it is given. No notice to or demand on any Borrower or Guarantor will entitle any Borrower or Guarantor to any other or further notice or demand in the same, similar or other circumstance.

**7.7. Entire Agreement; Supremacy Clause.**

(a) This Agreement and the other Loan Documents (including the documents and instruments referred to herein) constitute the entire agreement and supersede all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

(b) It is hereby agreed that the terms and conditions of the Loan Documents, as modified by this Agreement, shall remain in full force and effect and shall be binding upon Borrower and Guarantors. It is understood and agreed that in the event there are any conflicting or omitted provisions or variations between the terms, conditions, rights or remedies in the Loan Documents and the terms of this Agreement, this Agreement shall prevail and control in each instance.

**7.8. Counterparts.** This Agreement may be signed in any number of counterpart copies and by the parties hereto on separate counterparts, but all such copies shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart. Any party so executing this Agreement by facsimile transmission shall promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by facsimile transmission.

**7.9. Successors and Assigns.** This Agreement will be binding upon and inure to the benefit of Borrower and Guarantors, Lender and their respective heirs, executors, administrators, successors and assigns; provided, however, that Borrower and Guarantors may not assign this Agreement in whole or in part without Lender's prior written consent and the Lender at any time may assign this Agreement in whole or in part.

**7.10. Interpretation.** In this Agreement, unless Borrower and Guarantors and the Lender otherwise agree in writing, the singular includes the plural and the plural includes the singular; words

EXTENSION AGREEMENT (SPRINGS BUILDING)

importing any gender include the other genders; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or", the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; references to articles, sections (or subdivisions of sections) or exhibits are to those of this Agreement; and references to agreements and other contractual instruments shall be deemed to include all subsequent amendments and other modifications to such instruments, but only to the extent such amendments and other modifications are not prohibited by the terms of this Agreement. Section headings in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. Unless otherwise specified in this Agreement, all accounting terms shall be interpreted and all accounting determinations shall be made in accordance with GAAP. If this Agreement is executed by more than one party as Borrower and Guarantors, the obligations of such persons or entities will be joint and several.

      **7.11. Assignments and Participations.** At any time, without any notice to Borrower or Guarantors, Lender may sell, assign, transfer, negotiate, grant participations in, or otherwise dispose of all or any part of Lender's interest in the Loans. Borrower and Guarantors hereby authorize Lender to provide, without any notice to Borrower or Guarantors, any information concerning Borrower and Guarantors, including information pertaining to Borrower and Guarantors' financial condition, business operations or general creditworthiness, to any person or entity which may succeed to or participate in all or any part of Lender's interest in the Loans.

      **7.12. Governing Law and Jurisdiction.** This Agreement has been delivered to and accepted by the Lender and will be deemed to be made in the State of Nevada. THIS AGREEMENT WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEVADA, EXCLUDING ITS CONFLICT OF LAWS RULES. Notwithstanding any provision of the Loan Documents, Borrower and Guarantors hereby irrevocably consent to the exclusive jurisdiction of any state or federal court in the county or judicial district of Clark County, Nevada; provided that nothing contained in this Agreement will prevent Lender from bringing any action, enforcing any award or judgment or exercising any rights against Borrower and Guarantors individually, against any security or against any property of Borrower and Guarantors within any other county, state or other foreign or domestic jurisdiction. Lender and Borrower and Guarantors agree that the venue provided above is the most convenient forum for Lender and Borrower and Guarantors. Borrower and Guarantors waive any objection to venue and any objection based on a more convenient forum in any action instituted under this Agreement.

      **7.13. WAIVER OF JURY TRIAL.** BORROWER AND GUARANTORS AND LENDER IRREVOCABLY WAIVE ANY AND ALL RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS, AGENTS OR SERVICERS IN CONNECTION THEREWITH. BORROWERS, GUARANTORS AND LENDER ACKNOWLEDGE THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.

| Borrower | Guarantor (Robinson) | Guarantor (PP) | Pledgor (Trust) | Lender |

EXTENSION AGREEMENT (SPRINGS BUILDING)

**7.14. No Fiduciary Relationship.**  Borrower and Guarantors agree that Lender has no fiduciary or similar obligations to Borrower and Guarantors and that their relationship is strictly that of creditor and debtor.

**7.15. Neutral Interpretation.**  This Agreement shall be construed in accordance with its intent and without regard to any presumption or any other rule requiring construction against the party causing the same to be drafted.

**7.16. Consultation with Legal Counsel.**  Borrower and Guarantors each acknowledge that they:  (a) have consulted with, or have had the opportunity to consult with, independent legal counsel of their choice prior to entering into this Agreement (as applicable); (b) have reviewed this Agreement and the other Modification Documents in their entirety; (c) understands the effect of this Agreement and the other Modification Documents; (d) enter into this Agreement and the other Modification Documents (as applicable) freely and without duress or coercion; and (e) have not received any legal or tax advice from Lender or Lender's legal counsel in regard to the Modifications and the effect of this Agreement and the other Modification Documents.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

EXTENSION AGREEMENT (SPRINGS BUILDING)

IN WITNESS WHEREOF, the parties hereto have executed this Extension Agreement as of the Effective Date.

**BORROWER:**

**THE SPRINGS BUILDING, LLC,**
a Nevada limited liability company

By: _____

RONALD J. ROBINSON

Title:    Trustee of the Scotsman Trust under Trust Agreement dated June 1, 1996, Managing Member

**GUARANTORS:**

**RONALD J. ROBINSON**

By: _____

Ronald J. Robinson, an individual

**PARK PLACE PROPERTIES, LLC,**
a Nevada limited liability company

By: _____

Title: _____

**PLEDGOR:**

**THE SCOTSMAN TRUST DATED JUNE 1, 1996,**
a Nevada Trust

By: _____

Ronald J. Robinson

Title:    Trustee

**LENDER:**

**WESTERN ALLIANCE BANK,** an Arizona corporation

By: _____

Title: _____

Authorized Signer

EXTENSION AGREEMENT (SPRINGS BUILDING)

-11-

# EXHIBIT A

## FORM OF BORROWER AUTHORIZATION

EXHIBIT A TO EXTENSION AGREEMENT
(SPRINGS BUILDING)

# EXHIBIT "5"

## ASSIGNMENT OF PROCEEDS

This ASSIGNMENT OF PROCEEDS ("Assignment") is made and entered into as of the 19th day of October, 2017 (the "Effective Date"), by and between THE SPRINGS BUILDING, LLC, a Nevada limited liability company ("Springs Building"), THE SCOTSMAN TRUST DATED JUNE 1, 1996, a Nevada trust (the "Trust") and COHEN-JOHNSON, LLC ("Cohen-Johnson") (collectively, the "Assignor") on one hand and WESTERN ALLIANCE BANK, an Arizona corporation and successor in interest to Bank of Nevada ("Assignee") on the other hand.

### RECITALS

WHEREAS, the Loan is evidenced by an Amended and Restated Promissory Note (Note A), dated September 30, 2014, in the original principal amount of $4,000,000, executed by Springs Building in favor of Assignee, and an Amended and Restated Promissory Note (Note B), dated September 30, 2014, in the original principal amount of $1,743,655.65, executed by Springs Building in favor of Assignee (collectively, the "Notes").

WHEREAS, the Notes are secured by the security documents including, but not limited to, a Deed of Trust dated December 14, 2007, recorded in the Official Records of Clark County, Nevada (the "Clark Official Records") on December 20, 2007, as Document No. 20071220-0005531, granting Assignee a security interest in real property located at 375 Warm Springs Road, Las Vegas, Nevada and identified as Assessor's Parcel Number 177-09-514-009 (the "Property"), and as amended by Modification of Deed of Trust and Assignment of Rents and Leases, dated September 30, 2014, recorded in the Clark Official Records on October 16, 2014 as Instrument No. 20141016-0002192.

WHEREAS, the Springs Building's Loan was unconditionally guaranteed by each of the Guarantors Robinson and Park Place pursuant to a personal guaranty executed on December 14, 2007 ("Guaranty").

WHEREAS, the Notes are further secured by the security documents including, but not limited to, a Deed of Trust, Security Agreement, Assignment of Rents, and Fixture Filing dated September 30, 2014, recorded in the Official Records of San Bernardino County, California (the "San Bernardino Official Records") on October 21, 2014, as Document No. 2014-0392826, wherein the Trust granted Assignee a security interest in additional real property located at 40588 Ironwood Drive, Big Bear Lake, California 92315 (the "California Property") and a Deed of Trust, Security Agreement, Assignment of Rents, and Fixture Filing dated September 30, 2014, recorded in the Clark Official Records on October 16, 2014, as Document No. 20141016-0002214, granting Assignee a security interest in real property located at 808 5th Street, Boulder City, Nevada 89005, and identified as Assessor's Parcel Number 186-09-610-034 (the "Boulder Property") pursuant to the Amendment to Loan Documents dated September 30, 2014.

WHEREAS, the Loan matured by its own terms on August 31, 2017 ("Maturity Date").

WHEREAS, the Springs Building entered into the Sale and Purchase Agreement dated August 25, 2017 (the "Purchase Agreement"), as the seller, and Cohen-Johnson as the buyer (the "Buyer").

07397-24/1956035

WHEREAS, in connection with the Purchase Agreement, on October 13, 2017, the Trust caused to be deposited on behalf of the Buyer a wire deposit of $100,000.00 to First American Title Insurance Company National Commercial Services in connection with Escrow No. NCS-866499-HHLV.

WHEREAS, Springs Building is required to pay off the matured Loan for the Payoff Amount.

WHEREAS, Springs Building is owner of the Property that is the subject the sale under the Purchase Agreement. and

WHEREAS, Assignor, the Trust and Cohen-Johnson desire to assign to Assignee the Payoff Amount arising from their respective rights, title and interest in and to the proceeds resulting from any sale of the Property by Assignor under the Purchase Agreement or to any other party, subject to the terms of this Assignment.

NOW, THEREFORE, in consideration of the mutual promises and covenants hereinafter set forth, Assignor, the Trust and Cohen-Johnson on one hand, and Assignee on the other hand, hereby agree as follows:

### AGREEMENT

1.      Assignment. Assignor, the Trust and Cohen-Johnson hereby absolutely, irrevocably, and unconditionally assigns to Assignee the earnest money deposit in the amount of $100,000.00 deposited by the Trust on behalf of the Buyer in connection with the Purchase Agreement ("Deposit"), which Deposit is held by First American Title Insurance Company National Commercial Services in connection with Escrow No. NCS-866499-HHLV, Assignor's right, title, and interest in and to the Deposit to repay the Loan in accordance with the Notes to Assignee. Assignee hereby accepts the foregoing assignment and agrees that the Deposit shall be applied to the Loan in accordance with the Notes and any other applicable agreements between the parties.

2.      Representations and Warranties of Assignor, the Trust and Cohen-Johnson. , the Trust and Cohen-Johnson hereby represent and warrant to Assignee that , the Trust and Cohen-Johnson have not pledged or promised to assign anyone other than Assignee any portion of the Deposit under the Purchase Agreement.

3.      Further Assurances. Assignor, the Trust and Cohen-Johnson and Assignee agree to execute such other documents and perform such other acts as may be reasonably necessary or proper and usual to effect this Assignment.

4.      Governing Law; Jurisdiction. This Assignment shall be construed under and enforced in accordance with the laws of the State of Nevada. The parties agree that any proceeding

brought with respect to the performance or enforcement of this Agreement shall be brought in a court of competent jurisdiction in the State of Nevada.

5.    Attorneys' Fees; Costs. Upon the bringing of any action or suit by either party under this Assignment relating to the subject matter hereof, the party in whose favor final judgment shall be entered shall be entitled to recover from the other party all costs and expenses of suit including, without limitation, reasonable attorneys' fees and costs.

6.    Counterparts. This Assignment may be executed by facsimile signature and in two or more counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute but one instrument. This Assignment shall become effective when one or more counterparts have been signed by each party hereto and delivered to each other party.

7.    Severability. If any provision of this Assignment or the application thereof becomes or is deemed by a court of competent jurisdiction or other governmental entity to be illegal, void, or unenforceable, the remainder of this Assignment will continue in full force and effect, and the application of such provision to other persons or circumstances will be interpreted so as reasonably to effect the express intent of the parties hereto. The parties further agree to replace such void or unenforceable provision of this Assignment with a valid and enforceable provision that will achieve, to the extent possible, the economic, business, and other purposes of such void or unenforceable provision.

[REMAINDER OF PAGE LEFT BLANK INTENTIONALLY]

8.  Successors and Assigns. This Assignment shall inure to the benefit of, and be binding upon, the successors, executors, administrators, legal representatives, and assigns of the parties hereto.

IN WITNESS WHEREOF, Assignor, the Trust and Cohen-Johnson and Assignee have executed this Assignment as of the Effective Date.

**ASSIGNOR**:
The Springs Building, LLC, a Nevada
limited liability company

By: _____
Name: Ronald J. Robinson
Its: Trustee of the Scotsman Trust under
Trust Agreement dated June 1, 1996,
Managing Member

**THE TRUST:**
The Scotsman Trust dated June 1, 1996, a
Nevada Trust

By _____
Name: Ronald J. Robinson
Its: Trustee

**BUYER:**
Cohen-Johnson, LLC

By: _____
Name: _____
Its: _____

**ASSIGNEE**:

Western Alliance Bank, an Arizona
corporation, successor in interest to Bank of
Nevada

By: _____
Name: _____
Its: _____

07397-24/1956035

8.    Successors and Assigns. This Assignment shall inure to the benefit of, and be binding upon, the successors, executors, administrators, legal representatives, and assigns of the parties hereto.

IN WITNESS WHEREOF, Assignor, the Trust and Cohen-Johnson and Assignee have executed this Assignment as of the Effective Date.

**ASSIGNOR:**
The Springs Building, LLC, a Nevada
limited liability company

By: _____
Name: Ronald J. Robinson
Its: Trustee of the Scotsman Trust under
Trust Agreement dated June 1, 1996,
Managing Member

**THE TRUST:**
The Scotsman Trust dated June 1, 1996, a
Nevada Trust

By: _____
Name: Ronald J. Robinson
Its: Trustee

**BUYER:**
Cohen-Johnson, LLC

By: _H. Stan John_____
Name: _H. Stan Johnson_____
Its: _Manager_____

**ASSIGNEE:**

Western Alliance Bank, an Arizona
corporation, successor in interest to Bank of
Nevada

By: _____
Name: _____
Its: _____

07397-24/1956035

8.    Successors and Assigns. This Assignment shall inure to the benefit of, and be binding upon, the successors, executors, administrators, legal representatives, and assigns of the parties hereto.

IN WITNESS WHEREOF, Assignor, the Trust and Cohen-Johnson and Assignee have executed this Assignment as of the Effective Date.

**ASSIGNOR**:
The Springs Building, LLC, a Nevada
limited liability company

By: _____
Name: Ronald J. Robinson
Its: Trustee of the Scotsman Trust under
Trust Agreement dated June 1, 1996,
Managing Member

**THE TRUST:**
The Scotsman Trust dated June 1, 1996, a
Nevada Trust

By: _____
Name: Ronald J. Robinson
Its: Trustee

**BUYER:**
Cohen-Johnson, LLC

By: _____
Name: _____
Its: _____

**ASSIGNEE**:

Western Alliance Bank, an Arizona
corporation, successor in interest to Bank of
Nevada

By: _____
Name: _____
Its: _____

# EXHIBIT "6"



HOLLEY·DRIGGS·WALCH
FINE·WRAY·PUZEY·THOMPSON

PLEASE REPLY TO LAS VEGAS OFFICE
WRITER'S EMAIL: OBROWN@NEVADAFIRM.COM

November 13, 2017

***Via U.S. Mail, Certified Mail and E-Mail (Robin1031@aol.com)***

The Springs Building, LLC
375 Warm Springs Road, Suite 100
Las Vegas, Nevada 89119

Park Place Properties, LLC
375 Warm Springs Road, Suite 100
Las Vegas, Nevada 89119

The Springs Building, LLC
c/o Ronald J. Robinson, Registered Agent
375 East Warm Springs Road Suite 100
Las Vegas, Nevada 89119

Park Place Properties, LLC
c/o Ronald J. Robinson, Registered Agent
375 East Warm Springs Road Suite 100
Las Vegas, Nevada 89119

Ronald J. Robinson
3785 Mesa Linda Drive
Las Vegas, Nevada 89120

Ronald J. Robinson
Trustee of the Scotsman Trust
Dated June 1, 1996
319 E. Warm Springs Road #100
Las Vegas, Nevada 89119

RE:    Loan from Western Alliance Bank, as successor in interest to Centennial Bank ("Lender"), in favor of The Springs Building, LLC, a Nevada limited liability company ("Borrower"), guaranteed by Ronald J. Robinson and Park Place Properties, LLC ("Guarantors")

**NOTICE OF DEFAULT:** Amended and Restated Promissory Note (Note A), dated September 30, 2014, in the original principal amount of $4,000,000, executed by Borrower in favor of Lender; Amended and Restated Promissory Note (Note B), dated September 30, 2014, in the original principal amount of $1,743,655.65, executed by Borrower in favor of Lender (collectively, the "Notes"); outstanding principal balance of Note A is $3,780,571.57; outstanding principal balance of Note B is $1,743,655.65 ("Loan").[1]

---

[1] The Loan Agreement, the Note, the Guaranty, and all other agreements, documents, and instruments evidencing or securing the Loan and the Note, as modified herein, are referred to individually and collectively as the "Loan Documents". All capitalized terms used in this letter but not otherwise defined herein have the meanings given in the Loan Documents.

07397-24/1965558.docx

The Springs Building, LLC
Ronald J. Robinson, Individually and as Trustee of the Scotsman Trust dated June 1, 1996
Park Place Properties, LLC
November 13, 2017
Page 2

Deed of Trust dated December 14, 2007, recorded in the Official Records of Clark County, Nevada, on December 20, 2007, as Doc. No. 20071220-0005531, granting Lender a security interest in real property located at Bermuda and Warm Springs Coml Ctr, Plat Book 79 Page 65, PT Lot 1, at 375 Warm Springs Road, Las Vegas, Nevada, identified as A.P.N. 177-09-514-009 ("Property"); amended by Modification of Deed of Trust and Assignment of Rents and Leases, dated September 30, 2014, recorded on October 16, 2014 as Inst. No. 20141016-0002192. Scotsman Trust dated June 1, 1996 granted Lender a security interest in real property located at 40588 Ironwood Drive, Big Bear Lake, California 92315 (the "California Property") and a Deed of Trust, Security Agreement, Assignment of Rents, and Fixture Filing dated September 30, 2014, recorded in the Clark Official Records on October 16, 2014, as Document No. 20141016-0002214, granting Lender a security interest in real property located at 808 5th Street, Boulder City, Nevada 89005, and identified as A.P.N. 186-09-610-034 (the "Boulder Property") pursuant to the Amendment to Loan Documents dated September 30, 2014.

Dear Mr. Robinson:

As you are aware, this law firm represents Lender in connection with the above-referenced default. The Loan matured by its own terms on August 31, 2017 ("Maturity Date"). As of the Maturity Date, the outstanding principal balance due and owing from the Borrower under the Loan was $5,531,439.84, excluding any fees, interest, penalties or any other charges under the Loan documents. Notwithstanding the expiration of the Maturity Date, the Borrower previously requested a sixty-day extension (the "Extension") of the Maturity Date from August 31, 2017, to October 31, 2017 (the "Extended Maturity Date"), which the Lender granted, in order to allow the sale of the Property to close pursuant to the existing Sale and Purchase Agreement dated August 25, 2017 (the "Purchase Agreement"), between Borrower, as Seller, and Cohen-Johnson, LLC (the "Buyer"). In conjunction with the Extension, the Borrower likewise requested a Discounted Payoff (the "DPO") of the loan in the amount of $4,000,000.00, which Lender approved. The Lender granted both the Extension and the DPO on the condition that the Loan would be paid off by the Extended Maturity Date.

In connection with the Extension, Borrower agreed to grant the Lender a collateral assignment of the $100,000 good faith deposit related to the Purchase Agreement (the "Deposit"), and in the event the purchase of the Property failed to timely close, the Buyer would not be entitled to the refund of the good faith deposit; such deposit was supposed to be forwarded to Lender to be applied to all amounts owing under the Loan pursuant to Joint Escrow Instructions submitted to

The Springs Building, LLC
Ronald J. Robinson, Individually and as Trustee of the Scotsman Trust dated June 1, 1996
Park Place Properties, LLC
November 13, 2017
Page 3

      First American Title Company for Escrow No. NCS-866499-HHLV.

      Among the conditions set forth in the Extension Documents that had to be met to ensure that the DPO of $4,000,000 would not expire by the Extended Maturity Date were the (i) timely closing of the sale of the Property, or (ii) cancellation by Buyer or Seller (Borrower) of the Purchase Agreement. At this time, Borrower is in default of the Extension because the sale of the Property under the Purchase Agreement failed to timely close,[2] and the Deposit has not been remitted to the Lender.

      As a result of the occurrence of the defaults referenced above, Lender hereby: (a) declares the Loan in default; and (b) demands that Borrower and/or Guarantors cure the defaults of the as required by the Loan Documents, all within fifteen (15) days from the date of this letter. As a further result of the defaults referenced above, Lender has incurred expenses and costs, including legal fees, all of which are due and payable by Borrower and Guarantor.

      The current amount due under the Note may be obtained by contacting:

Janice Maxwell
Vice President, Special Assets Officer
Western Alliance Bank
2701 E. Cambelback Road, Suite 110
Phoenix, Arizona 85016
Telephone: (602) 346-7301
JMaxwell@westernalliancebank.com

      If the defaults are not timely cured as set forth above, at the option of the Lender, Lender may pursue any and all of the rights and remedies available to Lender at law or in equity or delineated in the Loan Documents, including, without limitation: foreclosure of the collateral under the Loan Documents, increasing the interest rate on the Note to the 10% Default Rate; accelerating the Loan and declaring all amounts owed by the Borrower and Guarantors under the Loan Documents immediately due and payable; commencing action to foreclose upon the Properties encumbered by the respective Deeds of Trust; and commencing action against the Guarantors for payment. As there may be existing or potential events of default other than the defaults described in this Notice, Lender hereby reserves and preserves any and all of its rights and remedies under the Loan Documents and applicable law with regard to the defaults described in this Notice and any other existing or potential default under the Loan Documents.

---

[2] Notwithstanding requests from Lender's counsel, as of the date of this Letter, neither the escrow agent nor the Borrower have been forthcoming with any amended Purchase Agreement or amended escrow instructions, to the extent such have been executed between the Buyer and Borrower.

The Springs Building, LLC
Ronald J. Robinson, Individually and as Trustee of the Scotsman Trust dated June 1, 1996
Park Place Properties, LLC
November 13, 2017
Page 4

This Notice, any discussions by Lender and Borrower or its representatives, any discussions by Lender with Guarantors or their representatives, or Lender's acceptance of payment of less than the full amount due and payable under the Loan Documents do not constitute: (a) a waiver by Lender of the defaults in this Notice; (b) a waiver by Lender of any other breach or default by Borrower under the Loan Documents, whether or not referred to in this Notice or any prior notice; (c) an election of remedies by Lender with respect to any such breach or default, each of which reserves all rights and remedies available at law, in equity or under the Loan Documents; (d) a waiver, modification relinquishment or forbearance by Lender of any rights or remedies available, in equity or under the Loan Documents; or (e) modification of any of the Loan Documents.

No modification of the Loan Documents and no other agreement or understanding of any nature shall be deemed to have been entered into by or be binding on Lender unless and until Lender, Borrower, Guarantors, and every other entity deemed necessary and desirable by Lender have reached agreement on all issues, and such entire agreement has been reduced to a written document that expressly modifies the Loan Documents and is duly executed by parties. Oral agreements, emails, memoranda of meetings, summaries of proposed terms or other similar items shall have no effect and shall not bind Lender.

If you have any questions regarding this matter, please contact the undersigned.

Very truly yours,

HOLLEY DRIGGS WALCH
FINE WRAY PUZEY & THOMPSON

Ogonna M. Brown

cc:  Client
     Richard F. Holley, Esq.

ATTENTION TO ANY DEBTOR IN BANKRUPTCY OR ANY DEBTOR WHO HAS RECEIVED A DISCHARGE IN BANKRUPTCY OR WHO MAY HAVE PAID OR SETTLED, OR IS OTHERWISE NOT OBLIGATED UNDER, THE LOAN: Please be advised that this letter constitutes neither a demand for payment of the loan nor a notice of personal liability to nor action against any recipient hereof who might have received a discharge of the loan in accordance with applicable bankruptcy laws or who might be subject to the automatic stay of Section 362 of the United States Bankruptcy Code, or who has paid or settled or is otherwise not obligated by law for the loan.

07397-24/1965558.docx

Holley Driggs Walch Fine Wray Puzey Thomp
400 S 4TH ST # 3
LAS VEGAS NV 89101-6201

US POSTAGE AND FEES PAID
FIRST-CLASS
Nov 13 2017
Mailed from ZIP 89101
1 oz First-Class Mail Letter



071S00777793

## USPS CERTIFIED MAIL



**9414 8108 9876 5001 2312 21**

Ronald J. Robinson
3785 MESA LINDA DR
LAS VEGAS NV 89120-3131

---

Holley Driggs Walch Fine Wray Puzey Thomp
400 S 4TH ST # 3
LAS VEGAS NV 89101-6201

US POSTAGE AND FEES PAID
FIRST-CLASS
Nov 13 2017
Mailed from ZIP 89101
1 oz First-Class Mail Letter



071S00777793

## USPS CERTIFIED MAIL



**9414 8108 9876 5001 2312 07**

Park Place Properties LLC
co Ronald J. Robinson Registered Agent
375 E WARM SPRINGS RD STE 100
LAS VEGAS NV 89119-4260

---

Holley Driggs Walch Fine Wray Puzey Thomp
400 S 4TH ST # 3
LAS VEGAS NV 89101-6201

US POSTAGE AND FEES PAID
FIRST-CLASS
Nov 13 2017
Mailed from ZIP 89101
1 oz First-Class Mail Letter



071S00777793

## USPS CERTIFIED MAIL



**9414 8108 9876 5001 2311 39**

The Springs Building LLC
c-o Ronald J. Robinson Registered Agent
375 E WARM SPRINGS RD STE 100
LAS VEGAS NV 89119-4260

07397-24/1965558.docx

Holley Driggs Walch Fine Wray Puzey Thomp
400 S 4TH ST # 3
LAS VEGAS NV 89101-6201

US POSTAGE AND FEES PAID
**FIRST-CLASS**
Nov 13 2017
Mailed from ZIP 89101
1 oz First-Class Mail Letter



071S00777793

### USPS CERTIFIED MAIL



**9414 8108 9876 5001 2311 08**

Park Place Properties LLC
375 E WARM SPRINGS RD STE 100
LAS VEGAS NV 89119-4260

---

Holley Driggs Walch Fine Wray Puzey Thomp
400 S 4TH ST # 3
LAS VEGAS NV 89101-6201

US POSTAGE AND FEES PAID
**FIRST-CLASS**
Nov 13 2017
Mailed from ZIP 89101
1 oz First-Class Mail Letter



071S00777793

### USPS CERTIFIED MAIL



**9414 8108 9876 5001 2310 47**

The Springs Building LLC
375 E WARM SPRINGS RD STE 100
LAS VEGAS NV 89119-4260

---

Holley Driggs Walch Fine Wray Puzey Thomp
400 S 4TH ST # 3
LAS VEGAS NV 89101-6201

US POSTAGE AND FEES PAID
**FIRST-CLASS**
Nov 13 2017
Mailed from ZIP 89101
1 oz First-Class Mail Letter



071S00777793

### USPS CERTIFIED MAIL



**9414 8108 9876 5001 2313 82**

Ronald J. Robinson Trustee of the
Scotsman Trust Dated June 1 1996
319 E WARM SPRINGS RD STE 100
RONALD J ROBINSON TRUSTEE OF THE
LAS VEGAS NV 89119-4277

07397-24/1965558.docx

# EXHIBIT "7"



### *First American Title Insurance Company*
National Commercial Services
2500 Paseo Verde Parkway, #120, Henderson, NV 89074
(702)855-0860 - Fax (866)289-5654

## ESCROW INSTRUCTIONS
## RELEASE OF FUNDS PRIOR TO CLOSE

To: First American Title Insurance Company       File No.: NCS-866499-HHLV (NP)
National Commercial Services
2500 Paseo Verde Parkway, #120,

Henderson, NV 89074
Escrow Officer: Nikki Prine                      Today's Date: 02/09/2018
                                                 Settlement Date:  TBD

Re: 319 East Warm Springs, Las Vegas, NV 89119

You hold in the above referenced escrow the sum of **$100,000.00** .

Buyer and Seller have agreed that the sum of **$100,000.00**  is to be released prior to the consummation and closing of this escrow.

Buyer understands that **First American Title Insurance Company National Commercial Services** and its employees make no warranty or representation of any kind, expressed or implied as to the ownership of, or title to, the property described in this escrow, nor as to any encumbrances or liens thereon, nor as to the condition and/or the ultimate outcome of this escrow nor in any manner or form as an inducement to make the above payment. Buyer further realizes that no instruments in Buyer's favor have been recorded, nor Policy of Title Insurance issued.  Buyer nevertheless desires to release said funds.

THEREFORE, from funds now on deposit in this escrow, you are instructed to pay **$100,000.00** to the order of: **Western Alliance Bank, an Arizona corporation and successor in interest to Bank of Nevada**

Whether or not this escrow closes, you are not to be held liable or responsible for any loss or damage which Buyer might sustain by reason of making the above payment.

Escrow Holder will not disburse until funds deposited in escrow have cleared through bank on which drawn.

Each of the undersigned states and declares that he/she has read the foregoing instructions and understands, accepts and approves them and does hereby acknowledge receipt of a copy of these instructions.

**First American Title Insurance Company National Commercial Services**

File No.: NCS-866499-HHLV (NP)

2500 Paseo Verde Parkway, #120
Henderson, NV 89074

Date: 02/09/2018

The Springs Building, LLC, a Nevada limited
liability company

By: _____
   Alisa M. Davis, Managing Member

By: The Scotsman Trust, Managing Member

By: _____
   Ronald J. Robinson, Trustee

Cohen-Johnson, LLC

By: _____
Name: H. Stan Johnson
Title: Manager

# EXHIBIT "8"

Inst #: 20180420-0002385
Fees: $40.00
04/20/2018 02:28:35 PM
Receipt #: 3380426
Requestor:
FIRST AMERICAN TITLE PASEO
Recorded By: SOV  Pgs: 8
**DEBBIE CONWAY**
CLARK COUNTY RECORDER
Src: ERECORD
Ofc: ERECORD

APN: 177-09-514-009 and 186-09-610-034

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO:
First American Title Company
2500 Paseo Verde Parkway, Ste.120
Henderson, NV  89074

Trustee Sale No. 2533888A-IRK

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 12/14/2007. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

On **May 14, 2018 at 10:00 AM FIRST AMERICAN TITLE INSURANCE COMPANY, a Nebraska corporation,** as the duly appointed Trustee under and pursuant to a Deed of Trust recorded on **12/20/2007,** in **Book No. 20071220 as Document No. 00005531** executed by **THE SPRINGS BUILDING, LLC, a Nevada limited liability company,** as Trustor to secure obligations presently in favor of **WESTERN ALLIANCE BANK, an Arizona corporation,** as successor by merger to Centennial Bank, a California corporation as current Beneficiary, and a Deed of Trust dated **09/30/2014** executed by **RONALD J. ROBINSON AS TRUSTEE OF THE SCOTSMAN TRUST UNDER TRUST AGREEMENT DATED JUNE 1, 1996,** as Trustor, to secure obligations presently in favor of **WESTERN ALLIANCE BANK, an Arizona corporation,** as current beneficiary, recorded in **Book No. 20141016,** as **Document No. 0002214,** of official records in the Office of the Recorder of **Clark** County, State of Nevada as modified or amended, if applicable, **WILL SELL AT PUBLIC AUCTION TO THE HIGHEST BIDDER FOR CASH** (payable at time of sale in lawful money of the United States, by cash, a cashier's check drawn by a state or national bank, a cashier's check drawn by state or federal credit union or a cashier's check drawn by state or federal savings and loan association, savings association, or savings bank) all right, title, and interest conveyed to and now held by the Trustee in the hereinafter described  property under and pursuant to the Deed of Trust.

**APN: 177-09-514-009 and 186-09-610-034**

RECORDING REQUESTED BY

AND WHEN RECORDED MAIL TO:
First American Title Company
2500 Paseo Verde Parkway, Ste.120
Henderson, NV 89074

Trustee Sale No. 2533888A-IRK

## NOTICE OF TRUSTEE'S SALE

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 12/14/2007. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

On **May 14, 2018 at 10:00 AM FIRST AMERICAN TITLE INSURANCE COMPANY, a Nebraska corporation,** as the duly appointed Trustee under and pursuant to a Deed of Trust recorded on **12/20/2007**, in **Book No. 20071220** as **Document No. 00005531** executed by **THE SPRINGS BUILDING, LLC, a Nevada limited liability company,** as Trustor to secure obligations presently in favor of **WESTERN ALLIANCE BANK, an Arizona corporation,** as successor by merger to Centennial Bank, a California corporation as current Beneficiary, and a Deed of Trust dated **09/30/2014** executed by **RONALD J. ROBINSON AS TRUSTEE OF THE SCOTSMAN TRUST UNDER TRUST AGREEMENT DATED JUNE 1, 1996,** as Trustor, to secure obligations presently in favor of **WESTERN ALLIANCE BANK, an Arizona corporation,** as current beneficiary, recorded in **Book No. 20141016,** as **Document No. 0002214,** of official records in the Office of the Recorder of **Clark** County, State of Nevada as modified or amended, if applicable, **WILL SELL AT PUBLIC AUCTION TO THE HIGHEST BIDDER FOR CASH** (payable at time of sale in lawful money of the United States, by cash, a cashier's check drawn by a state or national bank, a cashier's check drawn by state or federal credit union or a cashier's check drawn by state or federal savings and loan association, savings association, or savings bank) all right, title, and interest conveyed to and now held by the Trustee in the hereinafter described property under and pursuant to the Deed of Trust.

Trustee Sale No. 2533888A-IRK

The sale will be *made,* but without covenant or warranty expressed or implied regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, interest thereon, estimated fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on the day of sale.

Place of Sale; **At the front entrance to Nevada Legal News located at 930 South Fourth Street, Las Vegas, Nevada, 89101.**

Legal Description: **SEE EXHIBIT "A" ATTACHED HERETO FOR COMPLETE LEGAL DESCRIPTION.**

The street address is **319 East Warm Springs Road, Las Vegas, NV 89119 and 808 Fifth Street, Boulder City, NV 89005**. Other common designation, if any, of the real property described above is purported to be: **APN: 177-09-514-009 and 186-09-610-034.**

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein. Said sale will be made, but without covenant or warranty, express or implied, regarding title, possession, encumbrances, condition, suitability for a particular purpose or the location or existence of any personal property, to satisfy the remaining principal sum of the note(s) secured by said Deed of Trust, with interest thereon, as provided in said note(s), advances, if any, under the terms of the Deed of Trust, estimated fee, charges and expenses of the Trustee and of the trusts created by said Deed of Trust, to wit:

Amount of unpaid balance and other charges: **$5,738,699.24 (Estimated).**

Accrued interest and additional advances, if any, will increase this figure prior to sale. The beneficiary may elect to bid less than their full credit bid.

**The beneficiary under said Deed of Trust heretofore executed and delivered to the undersigned a written Declaration of Default and Demand for Sale, and a written Notice of Breach and Election to Sell under Deeds of Trust. The undersigned caused said Notice of Breach and Election to Sell under Deeds of Trust to be recorded in the county where the real property is located and more than three months have elapsed since such recordation.**

Trustee Sale No. 2533888A-IRK

**THIS PROPERTY IS SOLD AS-IS, LENDER/BENEFICIARY IS UNABLE TO VALIDATE THE CONDITION, DEFECTS OR DISCLOSURE ISSUES OF SAID PROPERTY AND BUYER WAIVES THE DISCLOSURE REQUIREMENTS UNDER NRS 113.130 BY PURCHASING AT THIS SALE AND SIGNING RECEIPT.**

DATED: April 18, 2018

FIRST AMERICAN TITLE INSURANCE COMPANY
FORECLOSURE DEPARTMENT
2500 PASEO VERDE PARKWAY, STE. 120
HENDERSON, NV 89074
(702) 731-4131

_____
Russell M. Dalton, Vice President

STATE OF NEVADA        )
                                          : ss
COUNTY OF CLARK   )

This instrument was acknowledged before me on April 18, 2018
by: Russell M. Dalton, Vice President of First American
Title Insurance Company

_____
Notary Public



ROBIN DUCCINI
NOTARY PUBLIC
STATE OF NEVADA
COUNTY OF CLARK
My Comm. Expires: 11-07-2020
Certificate No: 05-94127-1

Trustee Sale No. 2533888A-IRK

Exhibit "A"
Legal Description

PARCEL 1:

A PARCEL OF LAND SITUATED IN A PORTION OF THE NORTHEAST QUARTER (NE1/4) OF THE NORTHEAST QUARTER (NE1/4) OF SECTION 9, TOWNSHIP 22 SOUTH, RANGE 61 EAST, M.D.B. & M., CLARK COUNTY, NEVADA, BEING A PORTION OF LOT 1 OF BERMUDA & WARM SPRINGS COMMERCIAL CENTER AS SHOWN BY MAP THEREOF ON FILE IN BOOK 79 OF PLATS, PAGE 65, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST QUARTER (NE1/4) OF SAID SECTION 9; THENCE SOUTH 00°04'18" WEST, ALONG THE EAST LINE THEREOF, 291.94 FEET TO A POINT; THENCE SOUTH 89°50'36" WEST, 911.02 FEET TO THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 89°50'36" WEST, 191.83 FEET; THENCE NORTH 00°02'48" EAST, 242.11 FEET TO A POINT ON THE SOUTH RIGHT OF WAY LINE OF WARM SPRINGS ROAD (100' WIDE); THENCE NORTH 89°51'09" EAST, ALONG SAID SOUTH LINE 191.83 FEET; THENCE SOUTH 00°02'48" WEST, 242.08 FEET TO THE POINT OF BEGINNING.

SAID PARCEL IS ALSO SHOWN AS LOT 1-E ON THAT CERTAIN RECORD OF SURVEY ON FILE IN FILE 153, OF SURVEYS, PAGE 71, RECORDED JANUARY 20, 2006 AS INSTRUMENT NO. 02803 IN BOOK 20060120, IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.

NOTE: THE ABOVE METES AND BOUNDS DESCRIPTION PREVIOUSLY APPEARED IN THAT CERTAIN DOCUMENT RECORDED JULY 13, 2006 IN BOOK 20060713 OF OFFICIAL RECORDS AS INSTRUMENT NO. 02424, CLARK COUNTY, NEVADA.

PARCEL 1A:

NON-EXCLUSIVE PERPETUAL EASEMENTS FOR PARKING AND PEDESTRIAN AND VEHICULAR ACCESS, INGRESS AND EGRESS AS SET FORTH IN THE DECLARATION OF CONDITIONS, COVENANTS, RESTRICTIONS AND RECIPROCAL EASEMENTS RECORDED FEBRUARY 3, 2004 IN BOOK 20040203 AS DOCUMENT NO. 01641 OF OFFICIAL RECORDS.

PARCEL 1B:

NON-EXCLUSIVE PERPETUAL EASEMENTS FOR PARKING AND PEDESTRIAN AND VEHICULAR ACCESS, INGRESS AND EGRESS AS SET FORTH IN THE DECLARATION OF CONDITIONS, COVENANTS, RESTRICTIONS AND

RECIPROCAL EASEMENTS RECORDED AUGUST 17, 2005 BOOK 20050817 AS DOCUMENT NO. 01740 OF OFFICIAL RECORDS.


PARCEL 1C:

NON-EXCLUSIVE PERPETUAL EASEMENTS FOR PEDESTRIAN AND VEHICULAR INGRESS AND EGRESS, UTILITIES AND PARKING PURPOSES, AS SET FORTH IN THE DECLARATION OF COVENANTS, CONDITIONS AND RESTRICTIONS AND RECIPROCAL EASEMENTS RECORDED AUGUST 14, 2006, IN BOOK 20060814 AS DOCUMENT NO. 02656 OF OFFICIAL RECORDS.


PARCEL 2:

LOT FOURTEEN (14) IN BLOCK FORTY-THREE (43) ACCORDING TO THE BLOCK PLAT OF BOULDER CITY, DATED JULY 15, 1959, NO. X 300-460. COMPRISING SHEETS 1-20 INCLUSIVE ON FILE IN THE CITY HALL, BOULDER CITY, NEVADA COPIES OF WHICH PLATS ENTITLED EXHIBIT "A" ARE ATTACHED TO AND BY REFERENCE INCORPORATED IN THAT CERTAIN LEASE OF LAND DATED JULY 16, 1959 AND RECORDED JULY 16, 1959 AS INSTRUMENT NO. 167324 IN THE OFFICE OF OFFICIAL RECORDS BOOK NO. 206, CLARK COUNTY, NEVADA. WHICH PLATS BY THIS REFERENCE ARE INCORPORATED HEREIN MADE A PART HEREOF WITH THE SAME EFFECT AS THOUGH PHYSICALLY ATTACHED THERETO.

## DESCRIPTION OF PERSONAL PROPERTY

(a)    All personal property (including, without limitation, all goods, supplies, equipment, furniture, furnishings, fixtures, machinery, inventory, and construction materials and software embedded in any of the foregoing) in which Grantor now or hereafter acquires an interest or right, which is now or hereafter located on or affixed to the Real Property or the Improvements or used or useful in the operation, use, or occupancy thereof or the construction of any Improvements thereon, together with any interest of Grantor in and to personal property which is leased or subject to any superior security interest, and all books, records, leases and other agreements, documents, and instruments of whatever kind or character, relating to the Real Property, Improvements, or such personal property;

(b)    All fees, income, rents, issues, profits, earnings, receipts, royalties, and revenues which, after the date hereof and while any portion of the Indebtedness remains unpaid or unperformed, may accrue from such personal property or any part thereof or from the Real Property, the Improvements or any other part of the Property, or which may be received or receivable by Grantor from any hiring, using, letting, leasing, subhiring, subletting, subleasing, occupancy, operation, or use thereof;

(c)    All of Grantor's present and future rights to receive payments of money, services, or property, including, without limitation, rights to all deposits from tenants of the Real Property or Improvements, rights to receive capital contributions or subscriptions from Grantor's partners or shareholders, amounts payable on account of the sale of partnership interests in Grantor or the capital stock of Grantor, accounts and other accounts receivable, deposit accounts, chattel paper (whether tangible or electronic), notes, drafts, contract rights, instruments, general intangibles, and principal, interest and payments due on account of goods sold or leased, services rendered, loans made or credit extended, together with title to or interest in all agreements, documents, and instruments, evidencing, securing or guarantying the same;

(d)    All other intangible property (and related software) and rights relating to the Real Property, the Improvements, the personal property described in Paragraph (a) above or the operation, occupancy, or use thereof, including, without limitation, all governmental and non-governmental permits, licenses, and approvals relating to construction on or operation, occupancy, or use of the Real Property or Improvements, all names under or by which the Real Property or Improvements may at any time be operated or known, all rights to carry on business under any such names, or any variant thereof, all trade names and trademarks relating in any way to the Real Property or the Improvements, and all good will and software in any way relating to the Real Property or the Improvements;

(e)    Grantor's rights under all insurance policies covering the Real Property, the Improvements, the Personal Property, and the other parts of the Property and any and all proceeds, loss payments, and premium refunds payable regarding the same;

(f)     All reserves, deferred payments, deposits, refunds, cost savings, and payments of any kind relating to the construction of any Improvements on the Real Property;

(g)     All water stock relating to the Real Property;

(h)     All causes of action, claims, compensation, and recoveries for any damage to, destruction of, or condemnation or taking of the Real Property, the Improvements, the Personal Property, or any other part of the Property, or for any conveyance in lieu thereof, whether direct or consequential, or for any damage or injury to the Real Property, the Improvements, the Personal Property, or any other part of the Property, or for any loss or diminution in value of the Real Property, the Improvements, the Personal Property, or any other part of the Property;

(i)     All as extracted collateral produced from or allocated to the Real Property, including, without limitation, oil, gas, and other hydrocarbons and other minerals;

(j)     All architectural, structural, mechanical, and engineering plans and specifications prepared for construction of Improvements or extraction of minerals or gravel from the Real Property and all studies, data, and drawings related thereto; and also all contracts and agreements of the Grantor relating to the aforesaid plans and specifications or to the aforesaid studies, data, and drawings or to the construction of Improvements on or extraction of minerals or gravel from the Real Property;

(k)     All commercial tort claims Grantor now has or hereafter acquires relating to the properties, rights, titles, and interests referred to in this Exhibit B or elsewhere in the Deed of Trust;

(l)     All letter of credit rights (whether or not the letter of credit is evidenced by a writing) Grantor now has or hereafter acquires relating to the properties, rights, titles and interest referred to in this Deed of Trust;

(m)     All proceeds from sale or disposition of any of the aforesaid collateral and all supporting Indebtedness ancillary thereto or arising in any way in connection therewith;

(n)     All of Grantor's rights in any and all warranties and guaranties with respect to any goods, materials, supplies, chattels, fixtures, equipment, machinery, building materials, and work in progress attached to or placed in or on any part of the Real Property, or used in connection with any construction on the Real Property, and all funds paid under, or set aside with respect to, such warranties;

(o)     All of Grantor's rights under any agreements affecting the Real Property, whether now existing or hereafter arising;

(p)     All contracts and contract rights, licenses, including without limitation, any and all of Grantor's alcohol and retail beverage licenses, causes of action, claims, condemnation proceeds, profits, concessions, fees, leases and lease guaranties, rents, security deposits, utility deposits, trademarks or trade names, utility contracts, maintenance contracts and

agreements, management contracts, service contracts, chattel paper, negotiable instruments, instruments, letters of credit, policies and proceeds of insurance, cash bank accounts, and refunds for taxes or premiums of any insurance, equipment, fixtures, furnishings, inventory and supplies, landscaping equipment, tools and supplies, computer or other control systems, accounts receivable for expenditures and any other payments, and related facilities owned by Grantor and located on the Real Property, together with all present and future attachments, accessions, replacements, additions, products and proceeds thereof;

(q)    All of Grantor's rights as a declarant, developer, or otherwise, including, without limitation, all voting and other rights under all covenants, conditions, and restrictions affecting the Real Property, the Improvements, or the master planned community of which the Real Property are a part, whether now existing or hereafter arising;

(r)    All of Grantor's rights in all plans, specifications, plats, agreements, assessments, reports, and surveys related to the Real Property;

(s)    All proceeds of any of the foregoing.

As used in this Exhibit B the terms "Indebtedness," "Note," "Property," "Real Property," "Improvements," and "Personal Property" shall have the meanings set forth in the Deed of Trust to which this Exhibit B is attached.

# EXHIBIT "9"

Electronically Recorded in Official Records, County of San Bernardino    3/28/2018 04:14 PM FV



**BOB DUTTON**
ASSESSOR - RECORDER - CLERK
867  SPL Title Services

Recording Requested by

and When Recorded Mail to:

Doc# **2018-0108368**

FIDELITY NATIONAL TITLE COMPANY
1101 Investment Blvd., Suite 170
El Dorado Hills, CA  95762

| Titles | 1 | Pages | 2 |
|---|---|---|---|
| Fees | | | 27.00 |
| Taxes | | | .00 |
| CA SB2 Fee | | | 75.00 |
| Others | | | .00 |
| Paid | | | 102.00 |

---

**Trustee Sale No. 17-00288-2    Loan No: 01003147513-47513 AND 01003147513-47521
APN 0308-121-39-0-000**

## NOTICE OF TRUSTEE'S SALE

NOTE: THERE IS A SUMMARY OF THE INFORMATION IN THIS DOCUMENT ATTACHED
注：本文件包含一个信息摘要
참고사항: 본 첨부 문서에 정보 요약서가 있습니다
NOTA: SE ADJUNTA UN RESUMEN DE LA INFORMACIÓN DE ESTE DOCUMENTO
TALA: MAYROONG BUOD NG IMPORMASYON SA DOKUMENTONG ITO NA NAKALAKIP
LƯU Ý: KÈM THEO ĐÂY LÀ BẢN TRÌNH BÀY TÓM LƯỢC VỀ THÔNG TIN TRONG TÀI LIỆU NÀY
*(The above statement is made pursuant to CA Civil Code §2923.3(d)(1). The Summary will not be
recorded pursuant to CA Civil Code §2923.3(a). It will be mailed to the Trustor(s) and/or vested
owner(s) only, pursuant to CA Civil Code §2923.3(d)(2).)*

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST, SECURITY AGREEMENT,
ASSIGNMENT OF RENTS, AND FIXTURE FILING DATED SEPTEMBER 30, 2014.
UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD
AT A PUBLIC SALE.  IF YOU NEED AN EXPLANATION OF THE NATURE OF THE
PROCEEDINGS AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

On April 26, 2018, at 12:00 PM, at the North Arrowhead Avenue entrance to the County Courthouse, 351
North Arrowhead Avenue, San Bernardino, CA 92401, FIDELITY NATIONAL TITLE COMPANY, as the
duly appointed Trustee (the "Trustee"), under and pursuant to the power of sale contained in that certain
Deed of Trust, Security Agreement, Assignment of Rents, and Fixture Filing recorded on October 21,
2014, as Instrument No. 2014-0392826 of official records in the office of the Recorder of San Bernardino
County, CA, executed by: RONALD J. ROBINSON, AS TRUSTEE OF THE SCOTSMAN TRUST UNDER
TRUST AGREEMENT DATED JUNE 1, 1996, as Trustor (the "Trustor"), in favor of WESTERN ALLIANCE
BANK, AN ARIZONA CORPORATION, as Beneficiary, and any modifications thereto are collectively
referred to herein from time to time as the "Deed of Trust", WILL SELL AT PUBLIC AUCTION TO THE
HIGHEST BIDDER, in lawful money of the United States, all payable at the time of sale, that certain
property situated in said County, California describing the land therein as:

LOT 62 OF TRACT NO. 12166, IN THE CITY OF BIG BEAR LAKE, COUNTY OF SAN BERNARDINO,
STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 168, PAGE(S) 88 THROUGH 90
INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

**NOTICE TO POTENTIAL BIDDERS:** If you are considering bidding on this property lien, you should
understand that there are risks involved in bidding at a trustee auction. You will be bidding on a lien, not
on the Property itself. Placing the highest bid at a trustee auction does not automatically entitle you to free
and clear ownership of the Property. You should also be aware that the lien being auctioned off may be a
junior lien. If you are the highest bidder at the auction, you are or may be responsible for paying off all

liens senior to the lien being auctioned off, before you can receive clear title to the Property. You are encouraged to investigate the existence, priority, and size of outstanding liens that may exist on this Property by contacting the county recorder's office or a title insurance company, either of which may charge you a fee for this information. If you consult either of these resources, you should be aware that the same lender may hold more than one mortgage or deed of trust on the Property.

**NOTICE TO PROPERTY OWNER:** The sale date shown on this notice of sale may be postponed one or more times by the mortgagee, beneficiary, trustee, or a court, pursuant to Section 2924g of the California Civil Code. The law requires that information about trustee sale postponements be made available to you and to the public, as a courtesy to those not present at the sale. If you wish to learn whether your sale date has been postponed, and, if applicable, the rescheduled time and date for the sale of this Property, you may call **714.730.2727** or visit this Internet Website **www.servicelinkasap.com**, using the file number assigned to this case **17-00288-2**. Information about postponements that are very short in duration or that occur close in time to the scheduled sale may not immediately be reflected in the telephone information or on the Internet Website. The best way to verify postponement information is to attend the scheduled sale.

The real Property heretofore described is being sold "as is". The street address and other common designation, if any, of the real Property described above is purported to be:

40588 IRONWOOD DRIVE, BIG BEAR LAKE, CA

The undersigned Trustee disclaims any liability for any incorrectness of the street address and other common designation, if any, shown herein.

Said sale will be made without covenant or warranty, express or implied, regarding title, possession, or encumbrances, to pay the remaining unpaid balance of the obligations secured by and pursuant to the power of sale contained in that certain Deed of Trust (together with any modifications thereto).

The total amount of the unpaid balance of the obligations secured by the Property to be sold and reasonable estimated costs, expenses and advances at the time of the initial publication of this Notice of Trustee's Sale is estimated to be $5,724,651.45 (Estimated), provided, however, prepayment premiums, accrued interest and advances will increase this figure prior to sale. Beneficiary's bid at said sale may include all or part of said amount. In addition to cash, the Trustee will accept a cashier's check drawn on a state or national bank, a check drawn by a state or federal credit union or a check drawn by a state or federal savings and loan association, savings association or savings bank specified in Section 5102 of the California Financial Code and authorized to do business in California, or other such funds as may be acceptable to the trustee. In the event tender other than cash is accepted, the Trustee may withhold the issuance of the Trustee's Deed Upon Sale until funds become available to the payee or endorsee as a matter of right. The Property offered for sale excludes all funds held on account by the Property receiver, if applicable.

DATE: March 26, 2018

FIDELITY NATIONAL TITLE COMPANY, TRUSTEE
17-00288-2
1101 Investment Blvd., Suite 170
El Dorado Hills, CA 95762
916-636-0114

_____
Sara Berens, Authorized Signor

**SALE INFORMATION CAN BE OBTAINED ON LINE AT www.servicelinkasap.com**
**AUTOMATED SALES INFORMATION PLEASE CALL 714.730.2727**

# EXHIBIT "10"

## Property Details

**Scotsman Trust**
**40588 Ironwood Dr, Big Bear Lake, CA 92315**

**APN: 0308-121-39**
**San Bernardino County**

### Owner Information

| | |
|---|---|
| Primary Owner: **SCOTSMAN TRUST** | Secondary Owner: |
| Mail Address: **375 E WARM SPRINGS RD LAS VEGAS NV 89119** | Site Address: **40588 IRONWOOD DR BIG BEAR LAKE CA 92315** |
| Assessor Parcel Number: **0308-121-39** | Phone: |
| Census Tract: **0112.05** | Tract Number: **12166** |
| Lot Number: **62** | Page Grid: **4811-E2** |

Legal description: **Lot: 62  District: 15  Tract No: 12166  Abbreviated Description: LOT:62 DIST:15 CITY:BIG BEAR LAKE TR#:12166 TRACT 12166 LOT 62 City/Muni/Twp: BIG BEAR LAKE**

### Sale & Loan Information

| | |
|---|---|
| Transfer Date: **02/08/2008** | Seller: **ROUNDS, MARILYN L; MARILYN L ROUNDS REVOCABLE TRUST** |
| Transfer Value: **$785,000** | Document #: **2008-0059792** |
| Cost/SF: **$223** | First Loan Amount: **N/A** |
| Sale Type: | Title Company: **FIRST AMERICAN TITLE INS CO** |
| Lender: | |

### Assessment & Tax Information

| | |
|---|---|
| Assessed Value: **$834,100** | Percent Improvement: **81.93%** |
| Land Value: **$150,700** | Tax Amount: **$9,123.36** |
| Improvement Value: **$683,400** | Tax Account ID: |
| Homeowner Exemption: | Tax Rate Area: **17-001** |
| Tax Status: **Delinquent: 2017** | Tax Year: **2017** |
| Market Improvement Value: | Market Land Value: |
| Market Value: | |

### Property Characteristics

| | |
|---|---|
| Use Code: **Single Family Residential** | Year Built: **1992** |
| Square Feet: **3,517 SF** | Lot Size: **9,438 SF** |
| Number of Units: **0** | No of Stories: **2** |

| | |
|---|---|
| Zoning: | Property Type: **Single Family Residential Properties** |
| Total Rooms: **8** | Bedrooms: **4** |
| Pool: | Bathrooms: **4** |

Owner Exclusions:

## Aerial Map



## Transaction History

**Scotsman Trust**
**40588 Ironwood Dr, Big Bear Lake, CA 92315**

**APN: 0308-121-39**
**San Bernardino County**

## Foreclosure Record

Recording Date: **03/28/2018**

Document #: **2018-0108368 BK-PG -**

Document Type: **Notice Of Trustee's Sale**

Auction Location: **351 NORTH ARROWHEAD, SAN BERNARDINO**

Auction Date/Time: **04/26/2018 12:00 P.M.**

Min. Bid Amount

Legal description: **Lot: 62**

Abbreviated Description: **TRACT: 12166; MB 168 PG 88-90**

## Foreclosure Record

Recording Date: **12/22/2017**

Document #: **2017-0544801 BK-PG -**

Document Type: **Notice Of Default**

Case Number: **17-00288-2**

Beneficiary Name:

Trustor Names: **ROBINSON, RONALD J; THE SCOTSMAN TRUST**

Trustee Name: **FIDELITY NATIONAL TITLE COMPANY**

Mailing Address: **1101 INVESTMENT BLVD# 170, EL DORADO HILLS, CA 95762-**

Trustee Phone #:

TS#: **17-00288-2**

Loan Doc #: **2014-0392826**

Loan Date: **10/21/2014**

Loan Amount: **N/A**

Contact Name: **WESTERN ALLIANCE BANK**

Attention:

Mailing Address: **1101 INVESTMENT BLVD# 170, EL DORADO HILLS, CA 95762-**

Legal description:

## Mortgage Record

Recording Date: **10/21/2014**

Document #: **2014-0392826 BK-PG -**

Loan Amount: **N/A**

Loan Type: **Multiple Loan Amounts**

TD Due Date:

Type of Financing: **Multiple Loan Amounts**

Interest Rate:

Lender Name: **WESTERN ALLIANCE BANK**

Lender Type: **Bank**

Borrowers Name: **ROBINSON, RONALD J; SCOTSMAN TRUST**

Vesting: **Trust**

## Prior Transfer

Recording Date: **02/08/2008**

Document #: **2008-0059792 BK-PG -**

Price: **$785,000**

Document Type: **Grant Deed**

First TD: **N/A**

Type of Sale: **Full-Computed From Transfer Tax**

Mortgage Doc #:

Interest Rate:

Lender Name:
Buyer Name: **THE SCOTSMAN TRUST; ROBINSON, RONALD J**
Buyer Vesting: **Trust**
Seller Name: **ROUNDS, MARILYN L; MARILYN L ROUNDS REVOCABLE TRUST**
Legal description: **Lot: 62 Tract No: 12166 Map Ref: MB168 PG88-90**
City/Muni/Twp: **BIG BEAR LAKE**

## Mortgage Record

| | |
|---|---|
| Recording Date: **08/31/2007** | Document #: <u>**2007-0505596 BK-PG -**</u> |
| Loan Amount: **$500,000** | Loan Type: **Credit Line** |
| TD Due Date: | Type of Financing: **Variable** |
| Interest Rate: | |
| Lender Name: **UNION BANK OF CALIFORNIA NA** | |
| Lender Type: **Bank** | |
| Borrowers Name: **ROUNDS, MARILYN L; THE MARILYN L ROUNDS REVOCABLE TRUST** | |
| Vesting: **Revocable Trust** | |

## Prior Transfer

| | |
|---|---|
| Recording Date: **06/12/2001** | Document #: <u>**20010226873 BK-PG -**</u> |
| Price: **$550,000** | Document Type: **Grant Deed** |
| First TD: **N/A** | Type of Sale: **Full-Computed From Transfer Tax** |
| Mortgage Doc #: | Interest Rate: |
| Lender Name: | |
| Buyer Name: **ROUNDS, MARILYN L; MARILYN L ROUNDS REVOCABLE TRUST** | |
| Buyer Vesting: **Revocable Trust** | |
| Seller Name: **SMITH, AMY R** | |
| Legal description: **Lot: 62 Tract No: 12166 Map Ref: MAP168 PG88-90** | |
| City/Muni/Twp: **BIG BEAR LAKE** | |

## Prior Transfer

| | |
|---|---|
| Recording Date: **05/10/2001** | Document #: <u>**20010179155 BK-PG -**</u> |
| Price: **N/A** | Document Type: **Intra-family Transfer Or Dissolution** |
| First TD: **N/A** | Type of Sale: **Non-Arms Length Transfer** |
| Mortgage Doc #: | Interest Rate: |
| Lender Name: | |
| Buyer Name: **SMITH, AMY** | |
| Buyer Vesting: **Married Woman As Her Sole And Separate Property** | |
| Seller Name: **SMITH, PHILIP** | |
| Legal description: **Lot: 62 Tract No: 12166 Map Ref: MB168 PG88-90** | |
| City/Muni/Twp: **BIG BEAR LAKE** | |

## Prior Transfer

| | |
|---|---|
| Recording Date: **05/10/2001** | Document #: <u>**20010179154 BK-PG -**</u> |
| Price: **N/A** | Document Type: **Grant Deed** |
| First TD: **N/A** | Type of Sale: **Price As "0", "None", "No Consideration"** |
| Mortgage Doc #: | Interest Rate: |

Lender Name:
Buyer Name: **SMITH, AMY**
Buyer Vesting: **Married Woman As Her Sole And Separate Property**
Seller Name: **ATA PARTNERS LTD**
Legal description: **Lot: 62 Tract No: 12166 Map Ref: MB168 PG88-90**
City/Muni/Twp: **BIG BEAR LAKE**

## Mortgage Record

| | |
|---|---|
| Recording Date: **09/16/1994** | Document #: |
| Loan Amount: **$314,000** | Loan Type: **Seller Take-back** |
| TD Due Date: | Type of Financing: |
| Interest Rate: | |
| Lender Name: **DIP BRAZE INC** | |
| Lender Type: **Seller** | |
| Borrowers Name: **ATA PARTNERS LTD** | |
| Vesting: | |

## Prior Transfer

| | |
|---|---|
| Recording Date: **09/16/1994** | Document #: **94-386577 BK-PG -** |
| Price: **$439,000** | Document Type: **Grant Deed** |
| First TD: **$314,000** | Type of Sale: **Full-Computed From Transfer Tax** |
| Mortgage Doc #: | Interest Rate: |
| Lender Name: **DIP BRAZE INC** | |
| Buyer Name: **ATA PARTNERS LTD** | |
| Buyer Vesting: | |
| Seller Name: **DIP BRAZE INC** | |
| Legal description: **Lot: 62 Tract No: 12166 Map Ref: MAP168 PG88-90** | |
| City/Muni/Twp: **BIG BEAR LAKE** | |

# EXHIBIT "11"

Inst #: 20180427-0000027
Fees: $40.00
RPTT: $0.00  Ex #: 007
04/27/2018 07:45:23 AM
Receipt #: 3385964
Requestor:
FIRST AMERICAN TITLE NCS
Recorded By: CDE  Pgs: 4
DEBBIE CONWAY
CLARK COUNTY RECORDER
Src: ERECORD
Ofc: ERECORD

A.P.N.:
186-09-610-034

R.P.T.T.:        -0-

When Recorded Mail To:  Mail Tax Statements To:
The Springs Building LLC
375 Warm Springs Road, #100
Las Vegas, NV  89119

# *GRANT, BARGAIN and SALE DEED*

*FOR A VALUABLE CONSIDERATION,* receipt of which is hereby acknowledged,

Ronald J. Robinson, Trustee of the Scotsman Trust Dated 6/01/1996

do(es) hereby *GRANT, BARGAIN and SELL* to

The Springs Building, LLC A Nevada Limited Liability

the real property situate in the County of Clark, State of Nevada, described as follows:

See Exhibit "A"

Subject to

1.       All general and special taxes for the current fiscal year.

2.       Covenants, Conditions, Restrictions, Reservations, Rights, Rights of Way and Easements
now of record.

*TOGETHER* with all tenements, hereditaments and appurtenances, including easements and
water rights, if any, thereto belonging or appertaining, and any reversions, remainders, rents,
issues or profits thereof.

By: The Scotsman Trust, Managing Member

By: _____
          Ronald J. Robinson, Trustee


(My commission expires: _____ )


STATE OF    **NEVADA**              )
                                                            : **ss.**
COUNTY OF    **CLARK**              )


This instrument was acknowledged before me on _January 29, 2018_ by **Ronald J. Robinson as Trustee of The Scotsman Trust as Managing Member of The Springs Building, LLC, a Nevada limited liability company**.

_____
                  Notary Public
(My commission expires: _____ )

TIAH BROOKS
NOTARY PUBLIC
STATE OF NEVADA
My Commission Expires: 11-5-2019
Certificate No: 99-58269-1

TIAH BROOKS
NO. 99-58269-1
EXP 11-5-19

EXHIBIT "A"

APN:  186-09-610-034

LOT FOURTEEN (14) IN BLOCK FORTY-THREE (43) ACCORDING TO THE BLOCK PLAT OF BOULDER CITY, DATED JULY 15, 1959, NO. X 300-460.  COMPRISING SHEETS 1-20 INCLUSIVE ON FILE IN THE CITY HALL, BOULDER CITY, NEVADA COPIES OF WHICH PLATS ENTITLED EXHIBIT "A" ARE ATTACHED TO AND BY REFERENCE INCORPORATED IN THAT CERTAIN LEASE OF LAND DATED JULY 16, 1959 AND RECORDED JULY 16, 1959 AS INSTRUMENT NO 167324 IN THE OFFICE OF OFFICIAL RECORDS BOOK NO 206, CLARK COUNTY, NEVADA.  WHICH PLATS BY THIS REFERENCE ARE INCORPORATED HEREIN MADE A PART HEREOF WITH THE SAME EFFECT AS THOUGH PHYSICALLY ATTACHED THERETO.

**STATE OF NEVADA**
**DECLARATION OF VALUE**

1.   Assessor Parcel Number(s)

   a) 186-09-610-034
   b)_____
   c)_____
   d)_____

2.   Type of Property

   a) ☐ Vacant Land      b) ☒ Single Fam. Res.
   c) ☐ Condo/Twnhse      d) ☐ 2-4 Plex
   e) ☐ Apt. Bldg.      f) ☐ Comm'l/Ind'l
   g) ☐ Agricultural      h) ☐ Mobile Home
   i) ☐ Other _____

| FOR RECORDERS OPTIONAL USE |
|---|
| Book _____ Page: _____ |
| Date of Recording: _____ |
| Notes: _____ |

3.   a) Total Value/Sales Price of Property:      $ 0
     b) Deed in Lieu of Foreclosure Only (value of      ( $ _____ )
     c) Transfer Tax Value:      $ _____
     d) Real Property Transfer Tax Due      $ 0

4.   **If Exemption Claimed:**

   a.  Transfer Tax Exemption, per 375.090, Section: 7
   b.  Explain reason for exemption: transfer to or from a trust without consideration.

5.   Partial Interest: Percentage being transferred: _____ %

   The undersigned declares and acknowledges, under penalty of perjury, pursuant to NRS 375.060 and NRS 375.110, that the information provided is correct to the best of their information and belief, and can be supported by documentation if called upon to substantiate the information provided herein.  Furthermore, the parties agree that disallowance of any claimed exemption, or other determination of additional tax due, may result in a penalty of 10% of the tax due plus interest at 1% per month.  Pursuant to NRS 375.030, the Buyer and Seller shall be jointly and severally liable for any additional amount owed.

Signature: _____      Capacity: Grantor
Signature: _____      Capacity: _____

| **SELLER (GRANTOR) INFORMATION** | **BUYER (GRANTEE) INFORMATION** |
|---|---|
| **(REQUIRED)** | **(REQUIRED)** |
| Print Name: The Scotsman Trust Donald J Peterson trustee | Print Name: The Springs Building, LLC |
| 375 Warm Springs Road | 375 Warm Springs Road |
| Address: #100 | Address: #100 |
| City: Las Vegas | City: Las Vegas |
| State: NV    Zip: 89119 | State: Nv    Zip: 89119 |

**COMPANY/PERSON REQUESTING RECORDING (required if not seller or buyer)**

Print Name: First American      File Number: 644000
Address 2500 Paseo Verde Dr #120
City: Henderson      State: NV      Zip: 89074

(AS A PUBLIC RECORD THIS FORM MAY BE RECORDED/MICROFILMED)